**In re Josey M. JOHNSON, III and Pamela J. Johnson, Debtors.**

**Bankruptcy No. 98–11146.**

United States Bankruptcy Court,
E.D. Texas,
Beaumont Division.

Nov. 16, 1999.

Robert Barron, Nederland, Texas, for debtors.

Lynn E. Saarinen, Houston, Texas, for creditor, American Express Travel Related Services Company.

Michael Gross, Office of the Chapter 13 Trustee, Tyler, Texas.

## MEMORANDUM OF DECISION DENYING CONFIRMATION OF DEBTORS' FIRST AMENDED CHAPTER 13 PLAN

BILL G. PARKER, Bankruptcy Judge.

This matter is before the Court to consider confirmation of the First Amended Chapter 13 Plan (the "Plan") filed by the Debtors, Josey M. Johnson III and Pamela J. Johnson ("Debtors") in the above-referenced Chapter 13 case. An objection to the confirmation of the Plan was timely filed by American Express Travel Related Services Company ("Amex"), an unsecured creditor in this case. The Amex objection challenges a number of the asserted monthly expenditures of the Debtors and alleges that the Debtors are not applying all of their projected disposable income for the first three years of the Plan, in contravention of 11 U.S.C. § 1325(b)(1)(B). Amex also asserts that the Plan has not been proposed in good faith, as required by 11 U.S.C. § 1325(a)(3).[1]

### I. JURISDICTION.

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This matter is a core proceeding pursuant to the provisions of 28 U.S.C. § 157(b)(2)(A), (L) and (O).

### II. FACTUAL BACKGROUND.

The Debtors, Josey M. Johnson, III and his wife, Pamela J. Johnson, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code. At the time of the bankruptcy filing, included among the creditors to whom the Johnson were indebted was Amex, which holds an unsecured claim in the approximate amount of $20,645.37. The Debtors seek to confirm their First Amended Chapter 13 Plan which proposed a payment of $470.00 per month for a period of sixty (60) months. The Trustee calculates this payment will yield a dividend of less than 1% to general unsecured creditors.

According to the Debtors' amended schedules, the plan payments will be derived almost exclusively from the income of Mr. Johnson, who has been an employee of Mobil Chemical Company for approximately eighteen years. In the spring of 1998, Mr. Johnson was transferred by Mobil from an Illinois plant to the Mobil plant in Beaumont at which he works the same position but for less pay. He is currently employed as an operator at the Beaumont plant, from which he derives a net monthly take-home pay totaling $2,446.00, according to the Debtors' Amended Schedule of Current Income (Schedule I). Although Mr. Johnson occasionally works overtime and is "hopeful" regarding future raises, he acknowledged that there is no guarantee or assurance of any pay increase during the pendency of the proposed Plan. Since the Debtors' move to the Beaumont area, Mrs. Johnson has been employed as a clerical worker in a medical office. However, the Debtors are soon expecting another child and Mrs. Johnson anticipates a very limited work schedule after the delivery of her child. As a result, again according to the Debtors' Amended Schedule I, Mrs. Johnson anticipates a net monthly income of only $325.00 during the pendency of the Plan. Thus, the Debtors' net monthly income totals $2,771.00.

The Debtors' current expenditures, as claimed in their Amended Schedule of Current Expenditures (Schedule J), total $2,301.00. Included among these monthly expenditures is a child support payment owed by Mrs. Johnson in the amount of $200.00 [2], a telephone expense of $227.00, a

---

1. The Office of the Chapter 13 Trustee also participated in the confirmation hearing. Though its initial report to the Court recommended confirmation of the Plan, the Trustee submitted a post-hearing memorandum which, in light of the testimony adduced at the confirmation hearing, appears to support Amex's objection. However, the Trustee filed no formal position change with the Court.

2. This is court-ordered support to be paid by Mrs. Johnson for a dependent child who usu-

residential rental payment of $475.00, a $100.00 monthly medical expense, $150.00 for clothing expense, a $70.00 monthly laundry bill pertaining to the cleaning of Mr. Johnson's work attire, and a monthly transportation expense of $200.00, which Mr. Johnson testified was necessary for gasoline and maintenance costs on his 1993 Mazda automobile. The Debtors failed to budget any amounts for recreation or entertainment over the next five years nor will there apparently be any expenditure of a charitable nature. Further, the Debtors' budget makes no provision for the Debtors' expected child in any way. Mr. Johnson admitted that the budget provisions for food, clothing, and medical treatment is submitted do not encompass anticipated expenditures for the baby. Although several of its objections were mooted due to the substantial changes made by the Debtors to their proposed budget in the days immediately prior to the confirmation hearing, Amex challenges the reasonableness of the proposed monthly expenditures for telephone service, for clothing/laundry needs, as well as the purported child support obligation.

However troublesome any particular expenditure amount asserted by the Debtors in their amended budget might be, they are not as disturbing is the Debtors' previously undisclosed effort to repay an approximate sum of $21,000.00 which the Debtors borrowed from Mr. Johnson's accumulated balance in his 401(k)—type retirement plan at Mobil in an effort to pay creditors prior to the filing of the case. This debt is not referenced in any way in the Debtors' schedules, nor is the substantial monthly payment mentioned within their Amended Schedule of Current Expenditures or contained in the budget calculations from which the Debtors' proposed plan payment of $470.00 per month was derived. Although he could not state the precise figure, Mr. Johnson admitted that this debt is being repaid at an approximate rate of $500.00 to $550.00 per month through payroll deduction from his Mobil paychecks.

## III. *DISCUSSION.*

### A. *Disposable Income Test.*

Based upon its challenge to certain of the asserted monthly expenditures of the Debtors and the discovery of the Debtors' 401–k repayment, Amex asserts that the Debtors are not applying all of their projected disposable income to their plan for the first three years of its duration as required by 11 U.S.C. § 1325(b)(1)(B). In the context of considering confirmation of a chapter 13 plan proposed by a debtor who is not engaged in business [3], 11 U.S.C. § 1325(b) provides that:

(b)(1) [i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and

---

ally lives with her father. However, despite the fact that the child has been living with the Debtors for an extended period and Mrs. Johnson is no longer employed on a full-time basis, the Debtors inexplicably have no current plans to seek a modification of the court-ordered amount.

**3.** If a debtor is engaged in business, § 1325(b)(2)(B) also deletes from "disposable income" any income which must be expended "for the payment of expenditures necessary for the continuation, preservation, and operation of such business."

which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor. . . .

■ Since the definition of "disposable income" demands a delineation between those expenditures which are "reasonably necessary" from those which are not, this Court must engage in the unenviable task of scrutinizing the debtor's schedule of income and expenditures. This duty, though statutorily mandated, has understandably caused considerable trepidation among bankruptcy courts. "Determining what are reasonable and necessary expenses is an invitation for involvement of the Bankruptcy Courts in many difficult questions of lifestyle and philosophy." 5 NORTON BANKRUPTCY LAW & PRACTICE 2D § 122:10 at p. 122–101 (1997). *See also* 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY ¶ 5.36 at p. 5–102 (2nd ed. 1994) ("Determining reasonably necessary expenses drags the bankruptcy court into approving or disapproving of the debtor's lifestyle. . . .").

Given that the determination is extremely subjective, except for obvious necessities and luxury items, it is not surprising that courts have failed to articulate a precise standard for determining whether a particular expense is "reasonably necessary." Some courts have engaged in a strict scrutiny of particular expenses.[4] Others have been more deferential to the debtor.[5] Most courts appear to have settled at some median between these two extremes.

■ The brief legislative history regarding the adoption of the disposable income test offers some degree of guidance:

Chapter 13 relief is essentially equitable, and contemplates a substantial effort by the debtor to pay his debts. Such an effort, by definition, may require some sacrifices by the debtor, and some alteration in prepetition consumption levels. Thus, the debtor might reasonably be required to devote to the plan that portion of his income which is not necessary for support of the debtor and his family. The courts may be expected to determine norms for such support, and Labor Department cost of living figures may provide some help. This approach will also permit plans to be confirmed where the debtor does make a substantial effort to pay his debts, even though the payment is not substantial.

S.Rep. No. 65, 98th Cong. 1st Sess. 22 (1983). This brief passage indicates that Congress expects debtors to make a substantial effort, including some degree of sacrifice, in order to pay their debts, while recognizing that a substantial effort may not necessarily equate to a substantial payment. It further supports the imposition of the duty upon the courts to evaluate the propriety of debtors' budgets in order to determine what is, in fact, "reasonably necessary."

Of all of the methodologies which this Court has reviewed with regard to its duty to evaluate whether a particular expense is "reasonably necessary," the following approach, articulated by Judge Arthur Spector in *In re Gonzales*, 157 B.R. 604 (Bankr. E.D.Mich.1993), has been most useful:

The courts have consistently held that for purposes of § 1325(b)(2)(A), the phrase "maintenance or support" includes expenses for items or activities other than those which, such as food, clothing, and the like, are clearly essential. Indeed, the expense budget form prescribed by the Official Forms (Schedule J) recognizes that a family cannot

---

4. *See, e.g., In re Jones,* 55 B.R. 462, 466 (Bankr.D.Minn.1985) ("... the appropriate amount to be set aside for the debtor ought to be sufficient to sustain basis needs not related to [the debtor's] former status in society or the life style to which he is accustomed ...").

5. *See, e.g. In re Navarro,* 83 B.R. 348, 355 (Bankr.E.D.Pa.1988) ("In general, 11 U.S.C. § 1325(b) should not be considered a mandate for a court to superimpose its values and substitute its judgment for those of the debtor on basic choices about appropriate maintenance and support.").

live by bread alone. It acknowledges that there ought to be some allocation for "recreation, clubs, entertainment, newspapers, magazines, etc." and even "other." As with the debtor's other expenditures, of course, the statute limits this spending to that which is "reasonably necessary." Even non-discretionary expenditures such as for food and shelter can reflect discretionary lifestyle choices. Thus a debtor whose monthly car payment exceeds that which is reasonably necessary is in reality making a discretionary expenditure to the extent of the excess. No matter where the "fat" is hidden, such discretionary expenditures typically have more to do with enhancing one's quality of life, acquiring spiritual fulfillment or just simply relaxing and enjoying oneself, than with subsistence. Since no two people have the same tastes, interests or philosophical dispositions, these discretionary costs can run the gamut from making charitable donations to buying a ticket for a tractor-pull event. By lumping all discretionary expenses together, whether they derive from categories more commonly thought of in subsistence terms or from categories commonly thought of as clearly discretionary in nature, the bankruptcy judge will often obviate the need to pass judgment on specific expenditures, that is to say, micromanage the details of a debtor's life. The disposable income test is designed to balance the interest of creditors with the interest of the debtor in obtaining a fresh start. Thus the proper methodology is to aggregate all expenses projected by the debtor which somewhat more discretionary in nature, and any excessive amounts in the relatively nondiscretionary line items such as food, utilities, housing, and health expenses, to quantify a sum which, for lack of a better term, will be called "discretionary spending." . . . If the discretionary expenses in the aggregate allow the Debt-

ors to exceed their basic needs, including a reasonable reserve for recreation and exigencies (the reasonable "cushion"), then their plan cannot be confirmed.

*Id.* at 608–09 (citations omitted). While this approach is not flawless, it does attempt to engage in more holistic evaluation of the debtor's financial status and seeks to avoid what Judge Lundin labels as the "nonproductive game of hide and seek in which debtors offer endless combinations and permutations of 'discretionary' and 'essential' expenses." 2 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY ¶ 5.36 (2nd ed. Supp.1997).

As applied to the case at hand, while there are some discretionary expenses which might be questionable and the Court has serious concerns over the Debtors' refusal to contemplate a modification of the child support order in light of the changed circumstances regarding the custody of Mrs. Johnson's child, the Court need not reach those issues due to the revelation regarding the Debtors' repayment of his 401k loan.

### B. *Pension Plan Repayments.*

█ There is an overwhelming consensus among bankruptcy courts that a debtor's voluntary payment[6] into a pension, savings, retirement or investment-type plan, such as a 401–k plan, is not an expenditure reasonably necessary for a debtor's maintenance and support during the pendency of a Chapter 13 plan. As recently explained in *In re Nation,* 236 B.R. 150, 152 (Bankr.S.D.N.Y.1999):

Money paid or contributed by a debtor into any account, fund, plan or other repository for the debtor's own present or future benefit for savings, pension, or similar purposes is on its face "not reasonably necessary to be expended . . . for the maintenance or support of the debtor or a dependent of the debtor."

---

**6.** Such voluntary payment would obviously be denied from the debtor's future income

which, in a Chapter 13 case, constitutes property of the bankruptcy estate under § 1306(a).

If such money were "necessary for the maintenance or support of the debtor," obviously the debtor could not put it in a savings or pension account. In addition to the clear language of the statute, most courts have perceived an inherent unfairness in a debtor paying himself by funding his own savings account, retirement plan, or pension fund while paying creditors only a fraction of their just claims.

*Id.* at 152.

This rationale, often utilized in conjunction with an analysis that a debtor's withdrawal of funds from a pension plan does not create a "debt" or a "claim" which can properly be paid by a Chapter 13 debtor,[7] has been widely adopted to preclude confirmation of Chapter 13 plans under which debtors proposed to make "loan repayments" for funds which they borrowed from their pension, savings, retirement or similar-type plans while failing to pay unsecured creditors in full.[8] It similarly has been applied to prohibit debtors from continuing to deduct contributions to such plans during the life of a Chapter 13 plan.[9]

Only one recent case has rejected the majority position.[10] The court in *Buchferer* found that a debtor's repayment of a loan obtained from his pension fund did not violate the disposable income test because the pension plan administrator held a non-recourse secured claim against the debtor which could be properly addressed by the debtor's Chapter 13 plan. It determined that a non-recourse secured claim arose because the administrator had the right to offset the amount owed by the debtor against the debtor's remaining vested amounts in the pension plan. It is significant that, while many have acknowledged its existence, no other court has yet adopted the *Buchferer* analysis.[11]

---

**7.** This analysis is usually traced back to the Second Circuit opinion in *New York City Employees Retirement System v. Villarie (In re Villarie)*, 648 F.2d 810, 812 (2d Cir.1981) which found, in a Chapter 7 context, that when a person "borrows" from his own pension account, this does not give rise to a true "loan" in the sense of a legally enforceable debt or claim and that no debtor-creditor relationship is created.

**8.** *In re Harshbarger*, 66 F.3d 775, 777 (6th Cir.1995) (debtor's proposed repayment of loan to ERISA account "may represent prudent financial planning, but it is not necessary for the 'maintenance or support' of the debtors."); *In re Gilliam*, 227 B.R. 849 (Bankr. S.D.Ind.1998); *In re Anes*, 216 B.R. 514 (Bankr.M.D.Pa.1998) (agreeing with objecting trustee that repayment of borrowings from pension plan is nothing more than reestablishing the "savings" that originally occurred during the course of debtor's employment); *In re Fulton*, 211 B.R. 247 (Bankr.S.D.Ohio 1997) (finding under a strict application of *Harshbarger* that a proposal to repay a pension loan while unsecureds are being paid less than 100% violates the § 1322(a)(1) requirement of submission of income to the trustee and the § 1325(a)(3) requirement of good faith, even in the absence of an objection); *In re Delnero*, 191 B.R. 539, 543–44 (Bankr.N.D.N.Y.1996) (holding pension repayments violated § 1325(b) unless debtor could show such were a condition of his employment); *In re Scott*, 142 B.R. 126 (Bankr.

E.D.Va.1992); *In re Jones*, 138 B.R. 536, 539 (Bankr.S.D.Ohio 1991) ("it would be unfair to the creditors to allow the Debtors in the present case to commit part of their earnings to the payment of their own retirement fund while at the same time paying their creditors less than a 100% dividend.").

**9.** *In re Jaiyesimi*, 236 B.R. 145 (Bankr. S.D.N.Y.1999) (Blackshear, J., presiding) (pension contributions were not a condition of employment and therefore had to be discontinued); *In re Cornelius*, 195 B.R. 831, 835 (Bankr.N.D.N.Y.1995); *In re Moore*, 188 B.R. 671, 675 (Bankr.D.Idaho 1995); *In re Ward*, 129 B.R. 664, 668 (Bankr.W.D.Okla. 1991); see also, *In re Lampkin*, 221 B.R. 390, 392–93 (Bankr.W.D.Tex.1998) and *In re Watkins*, 216 B.R. 394, 396 (Bankr.W.D.Tex.1997) in which Judge Frank Monroe found, in the context of a § 707(b) substantial abuse analysis, that voluntary retirement contributions cannot be excluded from the definition of disposable income.

**10.** *In re Buchferer*, 216 B.R. 332 (Bankr. E.D.N.Y.1997).

**11.** The Court in *In re MacDonald*, 222 B.R. 69, 76 (Bankr.E.D.Pa.1998) did state that it found "considerable merit in the reasoning of *Buchferer*," but could not reach the same result based upon the evidentiary record before it.

In balancing a debtor's right to a fresh start against the right of creditors to demand that such debtor commit all of his disposable income to his performance under a Chapter 13 plan, it is difficult to imagine a circumstance wherein a debtor's proposal to repay a "loan" to a pension-type plan could be justified as "reasonably necessary" under § 1325(b), unless such debtor has, in fact, withdrawn money in excess of his vested amounts in the plan. In that circumstance, the debtor has effectively borrowed funds from other participants in the plan and a debtor-creditor relationship has been created. Otherwise, the only finds which the debtor has "borrowed" from the plan are the funds which the plan administrator was holding for the debtor's benefit all along. This is a significant distinction. It explains why a Chapter 13 plan which proposes the repayment of a mortgage or home equity loan is routinely .and legitimately confirmed, while a plan which proposes the repayment of a pension loan is likely to be rejected. While it is true that the debtor's contribution in each instance results in an increase of exempt assets protected from the reach of creditors under Texas law, one cannot escape the simple distinction that the mortgage payment is a return of money borrowed from a third-party source, while the pension repayment is a return of money to oneself.

Courts have further rejected the fact that the debtor might incur a tax liability and early withdrawal penalty if the repayment is precluded as a justification for a debtor's proposal to repay a "loan" to a pension-type plan.[12] These courts have generally observed that, even if a debtor is forced to address such a springing tax liability in his Chapter 13 plan as a priority claim, the resulting tax liability would likely be significantly smaller than the amounts which the debtor would otherwise be diverting to its pension account over the life of the Chapter 13 plan. Thus, the unsecured creditors would still enjoy a greater benefit by forcing the debtor to commit its disposable income to the plan in compliance with § 1325, even though some additional unsecured priority tax debt may accrue as a result.[13]

Perhaps the most compelling argument which has been proposed in order to justify a pension loan repayment as reasonably necessary is that such repayment is a mandatory condition of the debtor's continued employment. While at least one court has allowed a repayment under such a circumstance,[14] most courts have refused on the grounds that the debtors failed to prove that it was a condition of employment[15] or that the use of mandatory repayment language in plans or in statutes governing the applicable retirement system was not the equivalent of a condition of employment.[16]

12. *See, e.g., Nation,* 236 B.R. at 155 ("... courts have not found tax consequences that may arise either during or after a plan has been completed to be grounds for ignoring the statutory requirement that the debtor pay all his disposable income into the plan."); *In re Delnero,* 191 B.R. 539, 544 (Bankr. N.D.N.Y.1996) ("... the fact that the Debtors may incur certain tax liability if the employer is required to cease making deductions does not alter the Court's position that the deductions for the repayment of the loans are to be included in the Debtors' disposable income."); *Scott,* 142 B.R. at 135 ("This Court recognizes that the debtor will be deemed to have a hardship withdrawal from his ERISA pension account when the payments to the account cease and that such withdrawal will cause the debtor to incur tax liability for the withdrawn amount ... but the Court finds that the debtor may not avoid such liability and hardship to the detriment of his creditors."). However, the consideration of tax consequences is fact sensitive and must be analyzed on a case by case basis. *Jaiyesimi,* 236 B.R. at 149.

13. *Fulton,* 211 B.R. at 258.

14. *In re Colon Vazquez and Mejias,* 111 B.R. 19 (Bankr.D.P.R.1990) (finding that the evidence demonstrated that the repayment by a public school teacher was compulsory.)

15. *See, e.g., Delnero,* 191 B.R. at 543; *Anes,* 216 B.R. at 515; and *In re Goewey,* 185 B.R. 444, 446 (Bankr.N.D.N.Y.1995).

16. *See, Jaiyesimi,* 236 B.R. at 145 (continued pension contributions by debtors were not a condition of employment and therefore volun-

Courts have also held that the application of any such condition of employment must defer to the application of the disposable income test in Chapter 13 under the preemption doctrine.[17]

■ Other than the situation in which a debtor has borrowed more money from a pension or retirement plan than he has actually contributed to it, it is difficult to imagine a scenario under which a debtor's plan proposal to repay a pension "loan" could escape a characterization as an improper item of discretionary spending, which is not reasonably necessary for the maintenance and support of the debtor, and which is therefore precluded by § 1325(b), absent a 100% payment to unsecured creditors. Though a substantial number of different types of pension and retirement plans have been scrutinized by courts faced with this issue, virtually every court has reached the same conclusion. Until such time as the Congress enacts a statutory amendment to the Code which would clearly permit the continuance of such payments,[18] a debtor's proposal to continue the repayment of sums borrowed from one's own pension or retirement account or to continue voluntary contributions to such an account during the pendency of a Chapter 13 case must be subjected to intense scrutiny.

In the case at hand, there is little to scrutinize. The Debtors failed to present any information whatsoever regarding the nature or character of the pension plan to which Mr. Johnson contributes. There is no proof in the record even attempting to establish that the continued use of the Debtor's income to repay this "loan" is a reasonable and necessary expenditure. Thus, the Court concludes that the amount which has in the past been deducted by the Debtor's employer to repay the Debtor's 401–k "loan" constitutes disposable income which has not been applied to make payments under the Debtors' First Amended Chapter 13 Plan and, since such Plan does not propose a 100% payout to the holders of unsecured claims, such Plan cannot be confirmed under the requirements of 11 U.S.C. § 1325(b)(1)(B).

### C. Good Faith.

■ While the Debtors' plan cannot be confirmed because it fails to comply with § 1325(b)(1)(B), the Court feels compelled to address the good faith issues raised by the Debtors' conduct in this case. In failing to reference in any manner within their schedules the substantial monthly sum being deducted from Mr. Johnson's income for repayment of the 401–k loan, estimated by Mr. Johnson to be $500 to $550, the Debtors have cast considerable doubt over the legitimacy of their intentions in seeking Chapter 13 relief. All parties to this proceeding are left to ponder the ramifications of the Debtors' failure to accurately disclose their income and expenses in this proceeding, and to consider whether any reasonable conclusion can be reached other than that the Debtors

---

tary, as opposed to mandatory, notwithstanding the use of "shall" in the applicable statutory language).

**17.** *See, e.g., Nation,* 236 B.R. at 154–55 (regulations in the New York Retirement and Social Security Law and the New York City Employees Retirement System requiring a repayment to a debtor's own pension account "conflict with a debtor's right to confirm a Chapter 13 plan and her creditors' entitlement to receive all of the debtor's disposable income under Section 1325(b)(1)(B) ... [and thereby] mandate a distribution of the assets of the estate to the debtor herself in derogation of creditors' rights and express provisions of Chapter 13 of the Bankruptcy Code

... [and therefore] are preempted to the extent they create an obstacle to fulfillment of the Bankruptcy Code's purpose.")

**18.** Such an amendment is, in fact, contained in both the House (H.R.833) and Senate (S.625) proposals for "bankruptcy reform" currently being considered by the Congress. In both proposals, § 362(b) is amended to allow the continued withholding of income for payments to satisfy a loan made by certain qualified plans, § 523(a) is amended to make such a debt nondischargeable, and § 1322 is amended to preclude any material alteration of such a loan.

intentionally intended to mislead this Court and the creditors of this Estate. Certainly the Debtors' failure to provide a complete and accurate disclosure of their financial affairs precludes any finding that the Debtors' current plan was proposed in good faith. *See, e.g., Matter of Chaffin,* 816 F.2d 1070, 1074 (5th Cir.1987), *as subsequently modified,* 836 F.2d 215, 217 (5th Cir.1988).

## IV. *CONCLUSION*

For the reasons stated above, the confirmation of the Debtors' First Amended Chapter 13 Plan is denied. The Debtors shall file a new Chapter 13 plan within thirty (30) days of the date of this Order and, in the event that the Debtors fail to file a new Chapter 13 plan within thirty (30) days of the date of this Order, absent a further order of the Court extending such deadline for cause shown, or in the event that the Debtors thereafter fail to confirm such new Chapter 13 plan upon consideration by this Court under its normal procedures, this Chapter 13 case shall be dismissed, pursuant to § 349(a) of the Bankruptcy Code, without further notice or hearing and with prejudice to the rights of the Debtors to file a subsequent petition under any of the provisions of Title 11, United States Code, for a period of ninety (90) days from the entry of the order of dismissal. This memorandum of decision constitutes the Court's findings of fact and conclusions of law [19] pursuant to Fed. R.Civ.P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R.Bankr.P. 7052 and 9014. A separate order will be entered which is consistent with this opinion.

---

19. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.