**In re Jon Christopher WEBB, M.D. and Juanita W. Webb, Debtors.**

No. 99–62498.

United States Bankruptcy Court,
E.D. Texas,
Tyler Division.

May 16, 2001.

Don E. Williams, Attorney at Law, Longview, TX, for debtors.

John J. Talton, Office of Chapter 13 Trustee, Tyler, TX, for Michael Gross, Standing Chapter 13 Trustee.

### MEMORANDUM OF DECISION

BILL G. PARKER, Bankruptcy Judge.

This matter is before the Court to consider confirmation of the Amended Chap-

ter 13 Plan (the "Plan") filed by the Debtors, Jon Christopher Webb, M.D. and Juanita W. Webb ("Debtors"), in the above-referenced Chapter 13 case. The Chapter 13 Trustee objected to the confirmation of the Plan on the grounds that the Debtors are not applying all of their projected disposable income for the first three years of the Plan, in contravention of 11 U.S.C. § 1325(b)(1)(B) and, in violation of 11 U.S.C. § 1325(a)(4), are paying less on each allowed unsecured claim than the amount that would be paid on each such claim if the debtors' estate was liquidated under Chapter 7.[1] At the conclusion of the hearing, the parties were provided with the opportunity to submit post-submission briefing and, upon receipt of such briefing, the Court took the matter under advisement. This memorandum of decision disposes of all issues pending before the Court.[2]

### Background

The Debtors, Jon Christopher Webb, M.D. and his wife, Juanita W. Webb, filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code, primarily to address certain tax obligations due and owing by them to the Internal Revenue Service arising from Dr. Webb's medical practice. Dr. Webb is a psychiatrist who is currently employed as the medical director of the Sabine Valley Mental Health and Mental Retardation Center in Longview. The Debtors seek to confirm their Amended Chapter 13 Plan which proposes a monthly payment of $2,000.00 for a period of ten (10) months and a monthly payment of $1,800.00 for the succeeding thirty-eight (38) months, for a total gross sum of $88,400.00. This plan payment is derived from information set forth in Schedule I and Schedule J, as amended, of the Debtors' schedules wherein the Debtors profess to have a net monthly income of $9,640.00, derived solely from the income of Dr. Webb, and to incur monthly expenditures in the amount of $7,690.50. Following the application of the bar date for claims and the resolution of certain claim objections, the proposed plan contemplates the payment of secured claims totaling $11,718.24, the payment of priority claims totaling $65,875.86, and a distribution of $1,965.90 toward the satisfaction of seven (7) allowed unsecured claims totaling $195,385.60, for a projected dividend of 1.008% to unsecured creditors.

The Chapter 13 Trustee objected to the confirmation of the Debtors' proposed plan on the grounds that certain expenditures were inflated or were not reasonably necessary for the maintenance and support of the Debtors or their dependents,[3] and that, therefore, the Debtors were not utilizing all of their projected disposable income to fund the plan in violation of § 1325(b) of the Bankruptcy Code. Specifically, the Trustee questioned the reasonableness of private educational expenses for the Debtors' son for whom monthly tuition of $550.00, plus associated daycare and uniform costs, are paid to or as a result of the requirement of his attendance at the Crisman Preparatory School in Longview.

1. The Trustee waived his "best interests" objection at the hearing, in light of the testimony regarding the value of the doctor's accounts receivable.

2. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a). The Court has the authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A), (L), and (O).

3. During the pendency of this case, the Debtors wisely relinquished two Jaguar automobiles.

■ The Debtors have the ultimate burden of persuasion to prove that their projected expenditures are reasonably necessary for the maintenance and support of themselves or their dependents, *In re McNichols*, 249 B.R. 160, 167–68 (Bankr. N.D.Ill.2000), and they acknowledge that some of the expenses are unusual and in excess of those normally seen by this Court. Accordingly, the Debtors presented testimony in an effort to sustain their burden of proof with regard to the reasonableness and the necessity of the asserted expenses.

With regard to the educational needs of their son,[4] the Debtors offered the expert testimony of Dr. Shawn Safarimaryaki, a licensed physician and a child and adolescent psychiatrist who admittedly works with Dr. Webb at the Sabine Valley mental health center. He testified without contradiction that the Debtors' son is a twelve year-old suffering from: (1) Attention Deficit Hyperactive Disorder (ADHD); (2) a moderate-to-severe Generalized Anxiety Disorder; and possibly (3) an obsessive-compulsive mood disorder. While possessing an above-average IQ, the Debtors' son was described by Dr. Safarimaryaki as abnormally sad and anxious, with an impulsiveness which makes him easily distracted in a classroom environment. While some of those general symptoms might be true of any 12 year-old boy, the portraiture painted by Dr. Safarimaryaki presented a child who suffers from more than pre-adolescent angst. The child takes prescribed medication, including anti-depressants, and his condition was characterized as "fair to guarded." Dr. Safarimaryaki believes that the boy's tendencies place him at risk for substance abuse and that, if forced to be placed in a typical public school environment, his academic progress will be significantly impeded, if not precluded.

Dr. Webb supported that conclusion in providing details of the Debtors' experience in attempting to place their son in public schools. According to Dr. Webb, his son was constantly punished for behavioral problems and received little individual attention as to his particular educational needs or problems. While they would rather avoid the extra costs, the Debtors are convinced that the special programs and assistance offered at the Crisman School is necessary for the successful education of their son. Crisman provides a special curriculum, individually tailored in recognition of their son's special needs, and can provide individualized attention which is simply unavailable in a public school atmosphere.[5] There is no evidence in the record to the contrary.

As a part of their testimony regarding all budgeted expenditures, the Debtors presented evidence about the unique medical needs within their family which necessitates the highly unusual projected monthly expenditure of $1585.00 in that area. In addition to the psychotherapy necessary for their son, which costs approximately $390 per month, Mrs. Webb is also undergoing medical psychotherapy treatments under the care of Dr. Anthony Kowalski of Oklahoma City, OK at a cost of $500 per month.[6] Costs for prescribed

---

4. During the pendency of this case, the Debtors transferred their daughter from private school to public school and deleted asserted monthly expenses for her private education.

5. See Exhibits 30 and 31.

6. The ongoing physician-patient relationship is demonstrated by the fact that Dr. Kowalski was listed as a creditor in the Debtors' schedules. This relationship apparently continues, notwithstanding this unpaid indebtedness. However, the Debtors anticipate that the series of treatments will end in mid 2002 (Exhibit 11) and thus, though they are currently spending $500 per month for such sessions,

medicines for Mrs. Webb and her son arising from their respective medical treatments have been and are anticipated to be approximately $400 per month.[7] The Debtors have also scheduled a negotiated $500 per month to address post-petition medical bills totaling $22,500 which have been incurred as a result of ankle and gynecological surgery performed for Mrs. Webb's benefit. There is no dispute among the parties regarding the necessity of these expenditures.

### *Discussion*

### *Disposable Income Test*

Based upon its challenge to certain of the Debtors' monthly payments, particularly for their son's private school education, the Trustee asserts that the Debtors are not applying all of their projected disposable income to their plan for the first three years of its duration as required by 11 U.S.C. § 1325(b)(1)(B). In the context of considering confirmation of a chapter 13 plan proposed by a debtor who is not engaged in business[8], 11 U.S.C. § 1325(b) provides that:

(b)(1) [i]f the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

(2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

(A) for the maintenance or support of the debtor or a dependent of the debtor. . . .

■■■ Since the definition of "disposable income" demands a delineation between those expenditures which are "reasonably necessary" from those which are not, this Court must of necessity scrutinize the debtors' schedule of income and expenditures. This Court has previously reviewed the jurisprudence in this area in *In re Johnson,* 241 B.R. 394 (Bankr.E.D.Tex. 1999) in which this Court, in attempting to implement the statutory policy of balancing the interests of creditors with the interests of the debtor in obtaining a fresh start, endorsed the process of aggregating all expenses projected by the debtor which are somewhat more discretionary in nature,[9] together with any excessive amounts in the relatively nondiscretionary line items such as food, utilities, housing, and health expenses, to quantify a sum identified as "discretionary spending." "If the

---

its average cost over the life of the plan is $333 per month.

**7.** See Exhibit 13.

**8.** If a debtor is engaged in business, § 1325(b)(2)(B) also deletes from "disposable income" any income which must be expended "for the payment of expenditures necessary for the continuation, preservation, and operation of such business."

**9.** These would include expenditures which "typically have more to do with enhancing one's quality of life, acquiring spiritual fulfillment or just simply relaxing and enjoying oneself, than with subsistence," *Gonzales,* 157 B.R. at 608, while recognizing that non-discretionary expenditures such as for food and shelter can, in fact, reflect discretionary lifestyle choices if they are excessive.

discretionary expenses in the aggregate allow the Debtors to exceed their basic needs, including a reasonable reserve (or cushion) for recreation and exigencies, then their plan cannot be confirmed." *Johnson,* 241 B.R. at 399, *citing Gonzales,* 157 B.R. at 609.

### Private Education Expenses

■ The parties have noted a substantial split of authorities as to whether expenses incurred by a debtor to educate a child in a private school "is reasonably necessary for the maintenance or support of ... a dependent of a debtor." In the absence of some compelling circumstance, this Court agrees with those courts which have concluded that, generally speaking, a private school education is not reasonably necessary. *See, e.g., Univest–Coppell Village, Ltd. v. Nelson,* 204 B.R. 497 (E.D.Tex.1996)[rejecting the payment of monthly tuition for a private high school for debtors' daughter when debtors had no particular problem with the education offered at the local public school but who wished to defer to their daughter who insisted upon staying in a private school primarily because she was the first freshman to make the school's cheerleading squad]; *In re Jones,* 55 B.R. 462, 467 (Bankr.D.Minn.1985)["An expensive private school education is not a basic need of the Debtor's dependents, particularly in view of the high quality public education available in this country ...."]; *but see, In re Burgos,* 248 B.R. 446 (Bankr.M.D.Fla.2000) [allowing private tuition when the tuition amount to be paid was less than the amount to be paid to unsecured creditors, debtors had demonstrated strong religious beliefs, and the expense could have been reasonably antic-

ipated by creditors at the time credit was extended since the debtors' children had always attended Catholic schools]; and *In re Nicola,* 244 B.R. 795 (Bankr.N.D.Ill.2000)[considering the totality of circumstances, including the amount to be paid, the fact that the child had always attended private school, the religious beliefs of the Debtors, and some evidence of the inadequacy of the local public schools, in finding Catholic school tuition to be a reasonably necessary expense].

However, this case presents a more compelling circumstance. It involves more than a mathematical comparison, an expressed desire of parents, or the intransigence of a child. The evidence in this case establishes that this particular dependent has problems which raise significant doubts as to whether he can be properly educated without the specific assistance and attention offered in this particular private school. In the only case cited by the parties on this point, *In re Ehret,* 238 B.R. 85 (Bankr.D.N.J.1999), a debtor seeking to confirm a chapter 13 plan included an expense of $2,000 per month for private school tuition for his son's special education needs. In finding that the private school tuition was not a reasonably necessary expense, the *Ehret* court relied upon the fact that the debtor in that case offered no testimony, documentation or other explanation as to the existence or nature of his son's disability nor why private schooling was necessary to meet his special education needs.[10]

That is certainly not the case here. A licensed adolescent psychiatrist has testified without contradiction regarding the

---

**10.** Apparently that failure was based upon the debtor's assertion that the $2,000 monthly amount was irrelevant to confirmation since it would be paid by his non-debtor spouse.

The *Ehret* court rejected that position and found that it must consider the non-debtor spouse's income in determining the disposable income of the debtor.

various conditions and educational challenges faced by the Debtors' son and he is recommending his patient's continuation in the structured and therapeutic educational environment offered at the Crisman School. There is no evidence to contradict the credibility of these findings or recommendations. The father further testified as to the serious difficulties and miserable results previously encountered when he actually made an attempt to assimilate the child into a public school environment. Thus, this is not a situation in which money is being diverted to pay private school tuition for children who are fully capable to receive a proper education in the public school system. Stated bluntly, the evidence in this case is certainly more compelling than an absence of any explanation or a daughter's desire to stay on the cheerleading squad.

■ Yet the Trustee claims that, under *Ehret*, a chapter 13 debtor is compelled to explain why any costs for special educational needs are not being met by the local school district under the provisions of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, which obligates states to provide a "free appropriate public education" to all children with disabilities either by providing appropriate programs or by paying for appropriate private schooling. While this statute properly insures that a local school district cannot ignore the special educational needs of children located within its boundaries, this Court is not convinced that the existence of this statute imposes any burden upon a chapter 13 debtor with educational expenses for a special needs child to explain either why a local school district may not be meeting its statutory obligations under the IDEA or why a law-

suit to compel compliance by the district has not been initiated. This Court declines to utilize that legislation as a controlling consideration in these circumstances and, to the extent that *Ehret* stands for the proposition that the passage of the IDEA eliminates any opportunity of a debtor to demonstrate that certain educational costs for the special needs of his child are reasonably necessary, unless he provides an explanation as to why the local school district is failing to fulfill its statutory obligations to pay such costs, this Court respectfully disagrees. Accordingly, the Court concludes that the Debtors have demonstrated that the private school tuition and attendant costs in these circumstances are reasonably necessary for the maintenance and support of their dependent.

*Other Expenditures*

■ While the Debtors have successfully sustained their burden to demonstrate the need for private education costs, they have failed to establish that a number of other expenditures are, in fact, reasonably necessary for their maintenance and support. Though extensive and not as adequately explained as the private education expense, the Court has little reason to question the need to some degree for ongoing medical, psychotherapy and medication expenditures in this family. Nor does the Court seriously question the need for a future automobile payment [11], particularly since the availability of a second automobile will eliminate the necessity for future after-school care at the Crisman school.

However, setting aside those particular expenditures, the Debtors have failed to establish that a number of their proposed

---

11. Dr. Webb testified that, though the budgeted figure is based upon the former Jaguar monthly payment of $685.37, he anticipated such payment would not exceed $500.00 per month.

budget entries are, in fact, reasonably necessary. Among the monthly expenditures now asserted for the Debtors and their two children are:

| | | |
|---|---|---|
| Rent | $ | 900.00 |
| Electricity | $ | 215.48 |
| Telephone | $ | 222.00 |
| Cable | $ | 122.00 |
| Food | $ | 600.00 |
| Clothing | $ | 200.00 |
| Dry Cleaning | $ | 200.00 |
| Medical/Dental | $ | 1,585.47 |
| Transportation | $ | 300.00 |
| Recreation | $ | 145.00 |
| Auto Payment | $ | 685.37 |
| Orthodontics | $ | 200.00 |
| Prof. Fees | $ | 300.00 |
| Kids' Allowances | $ | 50.00 |
| Day Care | $ | 240.00 |
| Haircuts | $ | 120.00 |
| License Fee | $ | 50.00 |
| Prof. Supplies | $ | 50.00 |
| School Lunch | $ | 100.00 |
| Tuition | $ | 550.00 |
| Uniforms | $ | 70.00 |

These figures reveal that the Debtors have not only allocated almost $300.00 per month in clearly discretionary expenditures for recreation, cable and children's allowances, they have further incorporated substantial discretionary expenditures in the budget areas for essentials, such as food (including school lunches), clothing, laundry and dry cleaning, telephone, professional fees, haircuts, and orthodontics.[12] While the Debtors are free, to some extent, to utilize discretionary spending in these essential areas, these aggregate amounts not only exceed the Debtors' basic needs, some can be characterized only as excessive, even for families who are not under the protection of this Court.

While this Court does essentially apply a totality test in evaluating whether expenses are reasonable and necessary under § 1325(b)(2), the application of that test in this case does not remotely support a conclusion that the Debtors are applying all of their disposable income to payments under the proposed plan. The ultimate determination of the reasonableness of discretionary expenditures proposed by debtors in a Chapter 13 case is one of balance. While Chapter 13 debtors are not required to make drastic reductions in their living standards and adopt a totally spartan existence, neither are they permitted to "continue in the lifestyle that drove them to file bankruptcy and at the expense of their creditors." *Gonzales,* 157 B.R. at 611, *citing In re Sutliff,* 79 B.R. 151, 157 (Bankr. N.D.N.Y.1987). A Chapter 13 debtor must demonstrate that he is making a substantial effort to pay his debts and that demonstration does contemplate " . . . some sacrifices [or] . . . alteration in prepetition consumption levels." S.Rep. No. 65, 98th Cong. 1st Sess. 22 (1983).

In this case, the Debtors' budget shows little, if any, effort to alter their lifestyle to any significant degree. The Debtors arguably established at the confirmation hearing that these budgetary figures represented actual expenditures which they were currently making. However, a debtor's evidentiary presentation that a certain figure represents what is currently spent in a particular category does not demonstrate that such an expenditure is, in fact, reasonably necessary for one's maintenance and support. This is particularly true when money which might otherwise be distributable to creditors must be deferred to meet special educational and medical needs of family members. While the creditors should acknowledge that those needs should be legitimately met, the urgency of those needs should also be acknowledged by the Debtors prior to spending $200 per month on dry cleaning

---

12. They have also failed to account for the $240.00 in monthly after-school care costs saved through the purchase of a second automobile.

or telephone bills or over $120 per month on haircuts or cable tv.

Applying a reasonable standard to these categories, and again, setting aside any strict scrutiny of the proposed medical and automotive expenditures, it is not difficult to conclude that projected disposable income in excess of $1300.00 per month is being diverted by the Debtors from plan payments in the first three-year period of the proposed plan. The amounts sought to be reserved by the Debtors for one year's worth of dry cleaning exceeds the $1,965.90 which unsecured creditors would receive at the end of the Debtors' proposed 48 month plan. Because these discretionary expenses in the aggregate allow the Debtors to exceed their basic needs, including a reasonable cushion for recreation and exigencies, the Court concludes that they constitute an improper diversion of disposable income in violation of § 1325(b)(1)(B), which requires that all disposable income in the first three-year period of a plan be devoted to payments under such plan. Accordingly, the confirmation of the Debtors' proposed Chapter 13 plan must be denied.

The Debtors shall file a new Chapter 13 plan within thirty (30) days of the date of this Order and, in the event that the Debtors fail to file a new Chapter 13 plan within thirty (30) days of the date of this Order, absent a further order of the Court extending such deadline for cause shown, or in the event that the Debtors thereafter fail to confirm such new Chapter 13 plan upon consideration by this Court under its normal procedures, this Chapter 13 case shall be dismissed, pursuant to § 349(a) of the Bankruptcy Code, without further notice or hearing with prejudice to the rights

of the Debtors to file a subsequent petition under any of the provisions of Title 11, United States Code, for a period of ninety (90) days from the entry of the order of dismissal.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law [13] pursuant to Fed.R.Civ.P. 52, as incorporated into contested matters in bankruptcy cases by Fed. R. Bankr.P. 7052 and 9014. A separate order will be entered which is consistent with this opinion.

13. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.