In re Felice G. COHEN, Debtor.

Bankruptcy No. 99–19470–SBB.

United States Bankruptcy Court,
D. Colorado.

March 24, 2000.

Elizabeth Matthews, Denver, CO, for debtor.

Kelly J. Sweeney, Office of the U.S. Trustee, Denver, CO, for U.S. Trustee.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER came before the Court on February 22, 2000 on the United States Trustee's ("UST") Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) ("Motion") and Felice G. Cohen's ("Debtor") Response

thereto. The Court, having reviewed the file, the Debtor's Response and the evidence and testimony at the hearing, and being otherwise advised in the premises, enters the following findings of fact, conclusions of law and order.

For the reasons set forth herein, this Court concludes that the UST's Motion should be GRANTED and the Debtor's Chapter 7 Bankruptcy Case DISMISSED. However, the Court shall stay entry of an Order dismissing this case for 10 days to allow the Debtor the opportunity to convert this case to Chapter 13.

## I. JURISDICTION

This Court has jurisdiction in this matter pursuant to 28 U.S.C. § 157(a) and (b) and § 1334(a) and (e). This is a core matter in accordance with 28 U.S.C. § 157(b)(2)(A).

1. At the beginning of the hearing on the UST's Motion and the Debtor's Response, the UST and the Debtor provided to the Court Stipulated Facts and Exhibits for Hearing on Motion to Dismiss under 11 U.S.C. § 707(b). The parties, by their stipulation, agreed, verbatim, to the following specific facts:

1. The debtors [sic] is single and has no dependents.
2. The debtor lives in and owns her own home that was purchased in June of 1998 for the price of $214,000. There is one mortgage against the home, incurred in 1998 with a $191,600 balance on the note. Schedule Js filed in this case indicate that monthly house payments are $1,546 including taxes and insurance.
3. The debtor's average monthly income is $5,500. According to the most recently filed Amended [Schedule] I, the debtor has the following monthly deductions: $1486 in state and federal taxes; $274.00 in a 401K contributions [sic]; $53 insurance" [sic]; $380. [sic] for TDSP Loan and $150.00 for another TDSP Loan (the total 401K contributions and 401K loan repayments equal $804). After deductions, her average monthly net income is $3,147.
4. Assuming the repayment schedule remains, the debtor will have repaid the TDSP Loan with monthly payments of approximately $150.00 by August of 2001.
5. Assuming the repayment schedules remains, the debtor will have repaid the TDSP Loan with monthly payments of $380 by February 2000.

## II. FACTS[1]

### A. The Debtor

Debtor is single and has been employed by IBM for 20 years. During the past three years she has been employed as a contracts negotiator. In that position she works with the federal government and negotiates terms and conditions by and between IBM and the federal government. Debtor's Response to the UST's Motion and her testimony at trial indicate that this bankruptcy case was prompted, in part, by the break-up of a long-term domestic partnership relationship.

### B. The Debtor's Original Schedules and Statement of Financial Affairs

#### 1. Verification of Debtor

On February 20, 1999, Debtor signed her verification of the Statement of Finan-

6. The average monthly expense for veterinary care for animals owned by the debtor is approximately $69.00.
7. The debtor's gross earnings in 1998 from wages, salaries and tips was $83,196. The debtor failed to list this correct amount on her Statement of Financial Affairs, response to question 1.
8. The debtor did not include either or both U.S. West or MCI Communications as creditors holding unsecured nonpriority claims on Schedule F.
9. The debtor owed either or both U.S. West or MCI Communications at least $1,358.31 as of the petition date.
10. The debtor and U.S. West entered into an arrangement for the debtor to cure the outstanding amounts owed as of the petition date by making additional payments of $200 for the months of November, 1999 through April of 2000.
11. The debtor had both a savings share account and a checking account at the IBM Rocky Mountain Employees Federal Credit Union on the petition date.
12. The debtor has cable television with HBO + HBO2, Cinemax and Encore.
13. On Schedule F, filed by the debtor on July 28, 1999, the debtor lists $52,642.30 in predominantly unsecured credit purchases. There is no indication other than "ongoing" for when the claims were incurred and the consideration for those claims.
14. There is no indication in Schedule F or D of the two loans from the debtor's 401K plans.

cial Affairs, Summary and Schedules, Notice to Individual Consumer Debtor and Verification of Creditor Mailing Matrix. Roughly five months later, on July 24, 1999, Debtor signed her Voluntary Petition and Individual Debtor's Statement of Intention. Debtor filed her bankruptcy case on July 28, 1999.

### 2. *Assets and Liabilities*

Debtor owns two significant assets: (a) a three bedroom, three bathroom, 3,000 square foot home and (b) $70,000.00 in her employer's 401K plan. Debtor's home is located in Longmont, Boulder County, Colorado. This home is listed in her Schedules A, C and D. The Debtor schedules a secured claim on the home in the amount of $191,600.00. The Debtor's Schedule A indicates that the home has a current market value of $100,000.00. Schedule D lists the market value of the property as $200,000.00 and identifies an unsecured claim on the home in the amount of $91,600.00. Debtor testified that she purchased the home for $214,000.00 in May 1998.

The Debtor has scheduled only three secured claims: (a) a lease on a 1995 Subaru automobile with a claim amount of $7,469.46; (b) a first mortgage with Norwest Mortgage on Debtor's home in the amount of $191,600.00; and (c) a purchase money security interest held by Sears in a treadmill, microwave oven, washer and dryer with a scheduled value of $900.00 and a claim in the amount of $2,817.21. The Debtor has scheduled ten unsecured non-priority claims totaling $52,642.30. It is undisputed that these claims are consumer debts. The Debtor testified at trial that most of the debts listed were incurred over the course of the 12–year domestic partnership relationship and much of the debt was attributable to the Debtor's former partner. The Debtor schedules no unsecured priority obligations.

The Debtor's filed—and thus far, unchanged—Statements of Financial Affairs indicate that the Debtor was not subject to any lawsuit, garnishment, repossession or foreclosure at the time of filing. In addition, the Statement of Financial Affairs indicates that there were no losses from fire, theft, other casualty or gambling within the year preceding the case.

### 3. *Income and Expenses*

The Debtor's originally filed Schedule I ("Original Schedule I") included a contribution of $282.70 to the Debtor's 401K.

The Debtor, by her originally filed Schedule J ("Original Schedule J"), indicated that she incurred $500.00 in medical and dental expenses monthly and that she paid $300.00 per month to Sears. As set forth below, Debtor subsequently filed amended schedules and Debtor also testified at trial that the amounts entered were in error. According to the Debtor, these entries should have been listed at $50.00 and $30.00 respectively.

The Debtor's Original Schedule J also included the following monthly expenses: $400.00 per month for food, $100.00 for home maintenance, $50.00 for laundry and dry cleaning, and $100.00 for recreation, clubs and entertainment, newspapers, magazines, etc.

The Debtor's Original Schedule J provided that Debtor's total monthly expenses were $3,261.00.[2] The Debtor's Original Schedule I indicated that there was total net monthly income of $3,647.66. Thus, based on the Debtor's originally filed schedules, there was net monthly excess income over expenses of $386.66.[3]

### C. *The UST Motion for Dismissal and Subsequent Amendments to the Schedules*

On October 26, 1999, the UST filed a Motion to Extend Time to File a Motion to

---

**2.** The Original Schedule J has certain entries crossed off and replaced by handwritten entries. Taking into account these changes, monthly expenses total $3,611.00.

**3.** Using the handwritten entries entered on the Original Schedules J, the net monthly excess income over expenses is $36.66.

Dismiss Pursuant to 11 U.S.C. § 707(b) ("Motion to Extend Time"). The purpose behind the Motion to Extend Time was to allow the Debtor to provide information to the UST by November 5, 1999. The Court, on October 29, 1999, granted the Motion to Extend Time and allowed the UST to file a Motion to Dismiss Pursuant to 11 U.S.C. § 707(b) on or before November 12, 1999.

On November 12, 1999, the UST filed his Motion to Dismiss. The UST advised in the text of his Motion to Dismiss, that the Motion to Dismiss was filed, at least in part, as a result of Debtor's failure to provide any information to the UST.

On December 7, 1999, Debtor filed her Response, together with an Amended Schedule I ("Amended Schedule I") and J ("Amended Schedule J") (together "Amended Schedules"). The home maintenance expense is increased from $100.00 to $400.00 per month. The Amended Schedules, together with the Debtor's testimony at trial, indicate that this increase is based, in part, upon $100.00 per month yard maintenance and $120.00 air conditioning and heating system maintenance.[4] In addition, the Debtor, post-petition, replaced the water heater and air conditioner for the sum of $850.00. The Debtor also stated that she needs a new roof that will cost approximately $4,000.00. The replacement expense for the water heater, air conditioner and roof are factored into the $400.00 per month budgeted amount.

The Debtor's Amended Schedule J includes items that are related to her employment, but not compensated or reimbursed by her employer. The Debtor's Amended Schedule J includes a $100.00 expense for a cell phone evidently used for work which is not reimbursed by her employer. In addition, the Debtor includes a $26.00 charge for Internet service which is listed as necessary for the Debtor's employment.

The Debtor's Amended Schedule J provides for an increase in the Debtor's monthly telephone bill from $80.00 per month to $220.00 per month. The charges are characterized as $150.00 per month plus $200.00 per month for arrearages related to charges made by another person.

The Debtor's Amended Schedule J has created a new category for pets, supplementing her recreation expense. Debtor lists a total of $250.00 per month for pet care on her Amended Schedule J. In particular, Debtor itemizes the category as follows: $70.00 per month for dog food, $50.00 per month "veterinary maintenance"[5] and $180.00 for surgery "so far this year on elderly dog."[6]

The Sears monthly payment has been reduced in the Debtor's Amended Schedule J from $300.00 per month to $28.00 per month. Medical and dental has also been reduced to $40.00 per month.

### D. *February 14, 2000 Amended Schedule I*

After receiving the December 7, 1999 Amended Schedules I and J, on December 16, 1999, the UST filed his Request for an Order Requiring the Debtor to File an Amended Schedule I, in light of some remaining concerns the UST had in regard to the 401K contributions. The Court, on

---

**4.** It is unclear from the schedules and the evidence advanced by the Debtor whether the $120.00 air conditioning and heating system maintenance is a monthly charge or a charge incurred as part of the replacement of the water heater and air conditioner.

**5.** Debtor stipulated that the average monthly expense for "veterinary care" is $69.00. *Supra* note 1. The Debtor did not explain or clarify any distinction between "veterinary care" or "veterinary maintenance."

**6.** Obviously, the itemized parts of this entry do not equal the total monthly budgeted amount. The Amended Schedule J was filed on December 7, 1999. If surgery "so far this year" is $180.00, then the monthly budgeted expense is roughly $15.00 per month. Thus, according to the Amended Schedule J alone, the total for this entry is only $135.00 per month.

January 7, 2000, granted the Request and ordered Debtor to file an Amended Schedule I within 15 days. On February 14, 2000, 37 days after the January 7, 2000 Order and 22 days late, the Debtor filed her second Amended Schedule I ("Second Amended Schedule I").

The Debtor's Second Amended Schedule I, filed only days before trial, discloses that $274.00 per month is taken out of the Debtor's paycheck for the 401K contribution. In addition, $150.00 and $380.00 is taken out of the paycheck for debts secured by the 401K. Based upon the stipulation provided to the Court by the parties and the Debtor's testimony at trial, the $380.00 paid each month for the 401K loan has been paid in full. *Supra* note 1. The $150.00 paid each month for the second 401K loan will be repaid in full in August of 2001.[7] *Supra* note 1.

### III. *DISCUSSION*

A. *Substantial Abuse:*

11 U.S.C. § 707(b) provides, in pertinent part:

After notice and a hearing, the court, on its own motion or on a motion by the United States trustee ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

7. The original principal balance of this loan was approximately $6,000.00.

8. There are essentially three approaches to "substantial abuse." The Eighth and Ninth Circuits hold that a debtor's ability to pay his debts, standing alone, warrants dismissal pursuant to 11 U.S.C. § 707(b). *In re Koch,* 109 F.3d 1285 (8th Cir.1997); *In re Kelly,* 841 F.2d 908 (9th Cir.1988). This has also been referred to as a per se approach. The Fourth and Tenth Circuits apply a "totality of the circumstances" approach. *Stewart,* 175 F.3d at 809; *Green,* 934 F.2d at 572–73. The Sixth Circuit has adopted the "hybrid" approach. *In re Krohn,* 886 F.2d 123 (6th Cir.

In this case, there is no dispute as to whether the Debtor's debts are "primarily consumer debts." The parties agree that the Debtor's debts are, in fact, "primarily consumer debts." Thus, the sole issue before this Court is whether the granting of relief would be a "substantial abuse of the provisions" of Chapter 7 of the Bankruptcy Code.

The Tenth Circuit has adopted the "totality of the circumstances" approach in reviewing whether "substantial abuse" has occurred. *In re Stewart,* 175 F.3d 796 (10th Cir.1999). Under the "totality of the circumstances" approach a debtor's ability to repay his or her debts is a primary factor. *Id.* at 809, *citing In re Green,* 934 F.2d 568, 572–73 (4th Cir.1991). However, pursuant to *Stewart,* courts utilizing a "totality of the circumstances" approach are to consider other factors, including, but not limited to:

(1) sudden illness, calamity, disability, or unemployment; (2) cash advances and consumer purchases in far excess of ability to repay; (3) excessive or unreasonable family budget; (4) accurate refection of true financial condition in the debtor's schedules and statements of income and expenses; and (5) the debtor's good faith.

*Id.*[8]

B. *Burden of Proof:*

Under 11 U.S.C. § 707(b), "[t]here is a presumption in favor of grant-

1989). The "hybrid" approach is similar, if not identical in application and effect, to the "totality of the circumstances" approach. Using the "hybrid" standard, the Court first examines the ability of the debtor to repay his or creditors out of future earnings. This factor alone may be sufficient to warrant dismissal. However, the Sixth Circuit also analyzes other mitigating factors which may rebut the presumption of "substantial abuse." The other mitigating factors may include: "(1) whether the debtor enjoys a stable source of future income; (2) whether the debtor is eligible for adjustment of debt through Chapter 13; (3) whether state remedies exist to ease the financial predicament;

ing the relief requested by the debtor." Here, the United States Trustee has the burden of proving that this Chapter 7 filing should be dismissed as a "substantial abuse." *In re Higuera*, 199 B.R. 196, 200 (Bankr.W.D.Okla.1996). Although debtors are presumptively entitled to Chapter 7 relief, this presumption is not conclusive, and may be rebutted. *In re Ontiveros*, 198 B.R. 284, 289 (C.D.Ill.1996) (holding that the presumption may be rebutted by the fact that a debtor has the ability to repay his creditors under a Chapter 13 plan). The presumption in favor of the granting of relief

> is in reality a caution and a reminder to the bankruptcy court that the Code and Congress favor the granting of bankruptcy relief, and that accordingly "the court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present."

*Kelly*, 841 F.2d at 917 (citation omitted).

■ Surprisingly, it appears that courts within the Tenth Circuit have not specifically addressed the particular burden of proof required in prosecuting a motion to dismiss under 11 U.S.C. § 707(b) or the shifting of the burden of proof. Other courts, in addressing the burden of proof and burden shifting, have held that "[t]he movant has met the initial burden, and the presumption shifts 'if the sched-

ules indicate a debtor's ability to make very substantial payment on unsecured indebtedness.'" *In re Haffner*, 198 B.R. 646, 649 (Bankr.D.R.I.1996) (quoting *In re Snow*, 185 B.R. 397, 403 (Bankr.D.Mass. 1995)).[9] Once this burden is met, the burden then shifts to the debtor to produce evidence of entitlement to the relief sought. *Id.*[10] As discussed below, the UST met its burden at trial. The schedules demonstrate that the Debtor had the ability to make a very substantial payment to her unsecured creditors. Further, the evidence stipulated to and/or otherwise presented to the Court offer no mitigating factors that would justify relieving the Debtor of her obligations. Quite simply, the Debtor did not meet her burden once the burden had shifted.

### C. Repayment Ability:

#### 1. Schedule I—401K Plan Contributions and Loan Repayments

■ According to the Second Amended Schedule I, the Debtor's net monthly income is reduced by a total of $804.00 in 401K related savings contributions and loan repayments. The United States Trustee asserts that this 401K savings contribution should be considered in determining the Debtor's repayment ability. It is Debtor's contention that, because 401K savings are exempt from execution under

---

(4) the degree of relief obtainable through private negotiation; and (5) whether the debtor's expenses can be significantly reduced without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126–27. The feature that distinguishes the "totality of the circumstances" approach from the "hybrid" approach is that a court utilizing the "totality of the circumstances" standard may find substantial abuse, even if there is no ability to repay, if other factors are present. *Stewart*, 175 F.3d at 809.

**9.** In *Haffner*, the court held that it would utilize the "totality of circumstances" approach in analyzing the motion to dismiss before it. 198 B.R. at 649. The United States Bankruptcy Court for the District of Massachusetts in the *Snow* case seems to utilize a "totality of the circumstances" approach. In

addressing the views for analyzing 11 U.S.C. § 707(b), other than the per se or repayment ability approach, the court held that the various approaches "may be collectively summarized as requiring an analysis of the facts and circumstances of the individual case." 185 B.R. at 401.

**10.** Although not stated explicitly in available case law, presumably, the burden of proof in jurisdictions employing a standard that looks to repayment ability alone would require the debtor to demonstrate that there is, in fact, no repayment ability. It further appears that, in jurisdictions which apply the "totality of the circumstances" test, as here, the debtor could (1) demonstrate that there is, in fact, no repayment ability or (2) demonstrate that under the "totality of the circumstances" dismissal is not warranted.

Colorado law, the 401K voluntary contribution should not be considered in calculating the Debtor's repayment ability.

It appears that the issue of whether 401K voluntary contributions should be considered in calculating a debtor's repayment ability is a matter of first impression before this Court and the Tenth Circuit.[11] Jurisdictions utilizing the "totality of circumstances" approach, have often looked to the " 'disposable income' that would be available to pay creditors under a hypothetical Chapter 13 plan." *In re Heffernan,* 242 B.R. 812, 816 (Bankr.D.Conn. 1999).[12] "There is an overwhelming consensus among bankruptcy courts that a debtor's voluntary payment into a pension, savings, retirement or investment type plan, such as a 401K plan, is not an expenditure reasonably necessary for a debtor's maintenance and support during the pendency of a Chapter 13 plan." *Id.* at 818 (quoting *In re Johnson,* 241 B.R. 394, 399 (Bankr.E.D.Tex.1999)).

The Court recognizes that retirement and pension plans are favored and exempt assets, not part of a debtor's estate. *See* 11 U.S.C. §§ 522(b)(2), 541(c)(2) and Colo. Rev.Stat. § 13–54–102(1)(s). The Court also recognizes that voluntary contributions to a 401K plan may be wise and prudent financial planning for retirement. Such contributions, however, are not nec-essary for the "maintenance or support" of this Debtor. *See In re Lindsey,* 122 B.R. 157, 158 (Bankr.M.D.Fla.1991). Here, the Debtor intends to discharge 100% of her debts in a Chapter 7 case. It is, thus, anomalous and inequitable to allow her to commit part of her earnings to the payment of her own retirement fund—in which the Debtor, as of the date of the Debtor's filing, has accumulated the sum of approximately $70,000.00—and pay her unsecured creditors nothing. *See e.g., In re Harshbarger,* 66 F.3d 775, 778 (6th Cir. 1995) (the Court dismissed a Chapter 13 petition for failure to submit a plan that satisfied the disposable income requirements for confirmation, in part because of Debtors' contribution to a 401K plan).

Courts have applied the same statutory and equitable analysis to a debtor's repayment of a loan from a 401K plan or pension plan. *See In re Anes,* 195 F.3d 177, 180 (3d Cir.1999) (the court held that, in effect, the payments are actually contributions to the debtors' retirement account and are not reasonably necessary for a debtor's maintenance or support); *In re Jaiyesimi,* 236 B.R. 145, 148 (Bankr. S.D.N.Y.1999) (contributions to debtors' pension plans and repayments of their pension loans held to be disposable income); *In re Delnero,* 191 B.R. 539, 543 (Bankr.N.D.N.Y.1996) (pension loan repay-

---

11. The Court has found at least one case within the Tenth Circuit that addresses 401K contributions in the context of 11 U.S.C. § 523. *In re Hammond,* 236 B.R. 751 (Bankr.D.Utah 1998). In the *Hammond* case, the Chapter 7 debtor's ex-wife brought an adversary proceeding in order to except certain debts from discharge on the grounds that (1) pursuant to 11 U.S.C. § 523(a)(5) the debts were in the nature of support and/or (2) pursuant to 11 U.S.C. § 523(a)(15) the debtor had the ability to pay the debts and the benefit of discharge to the debtor would not outweigh the detriment to the ex-wife. In assessing 11 U.S.C. § 523(a)(15) and the debtor's ability to pay his divorce related obligation which was not in the nature of support, the Bankruptcy Court held that an expense claimed by the debtor for contribution to a retirement plan was not "reasonably necessary for maintenance or support."

12. Confirmation of a plan under Chapter 13 of the Bankruptcy Code is governed by 11 U.S.C. § 1325(b), which provides, in part:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
> (A) the value of the property to be distributed under the plan on account of such claims is not less than the amount of such claim; or
> (B) the plan provides that *all of the debtor's projected disposable income* to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.
> (Emphasis added.)

ments are to be considered disposable income to be included in the plan). As long as the loan repayment to the 401K plan is voluntary, the repayment of a loan from the Debtor's own 401K is not considered necessary for support or maintenance. *Anes,* 216 B.R. at 514; *In re Fulton,* 211 B.R. 247 (Bankr.S.D.Ohio 1997). Further,

> Although the failure to repay a loan from a 401K plan my result in a setoff against a debtor's future benefits and cause the debtor to incur a tax liability for an early withdrawal of retirement benefits, courts have tended not to recognize the obligation as a debt. The obligations are nonrecourse in nature, with the only asset "liable" for the debt being future benefits. Most importantly, the obligations are in substance debts to oneself.

*In re Shirley,* 2000 WL 150835, at *3 (Bankr.N.D.Iowa January 4, 2000) (quoting *In re Devine,* 1998 WL 386380, at *8 (Bankr.E.D.Pa. July 7, 1998)) (citations omitted).

The Debtor has a total of $804.00 deducted each month from her paycheck for 401K contributions and 401K loan repayments. Debtor stipulated and testified that her monthly loan repayment in the sum of $380.00 has ceased as the loan is paid in full. *Supra* note 1. The remaining $424.00 per month is disposable income that should be used to repay some of her unsecured debts. This Court realizes that there will be some tax consequences to the Debtor and, therefore, the sum of $804.00 will not be the full amount that can be contributed to repay creditors. However, at least $500 to $600 additional income per month could be utilized to pay Debtor's unsecured creditors.

### 2. *Amended Schedule J—Expenses*

#### a. *Summary*

Debtor's Amended Schedule J shows an increase of $630.00 in Debtor's monthly expenses as compared to her Original Schedule J. The categories evidencing significant increases are as follows:

| Expense | Schedule J | Amended Schedule J | Increase |
| --- | --- | --- | --- |
| Telephone | $50.00 | $350.00 | $300.00 |
| Other: | $0.00 | $100.00 (for cell phone) | $100.00 |
| Home Maintenance | $100.00 | $400.00 | $300.00 |
| Transportation | $100.00 | $242.00 | $142.00 |
| Recreation (Cable) | $0.00 | $58.00 | $58.00 |
| Internet Service Provider | N/A | $26.00 | $26.00 |
| Pets | N/A | $250 | $250.00 |

#### b. *Telephone Charges*

Debtor, according to her Amended Schedule J, also incurs $350.00 per month in telephone charges. Of this sum, roughly $150.00 is for personal—not business related—long distance phone use. Debtor has not provided any documents evidencing such large monthly phone bills. As a result, barring any evidence to the contrary, this sum is unreasonable and should be reduced by $75.00. *See In re Williams,* 201 B.R. 579, 581 (Bankr. M.D.Fla.1996) (the court reduced debtor's telephone expense budgeted in a Chapter 13 plan from $150.00 per month to $75.00 per month). The remaining $200.00 re-

lates to a repayment plan with the phone company for phone charges incurred by a third party which the Debtor has agreed to pay. According to the Debtor this will be paid in full by April of 2000. Thus, beginning in May 2000, expenses will be reduced by $200.00.

#### c. *Unreimbursed Business Expenses—Cell Phone, Internet Service Provider and Business Meals*

The Debtor advances that the $100.00 monthly charge for cell phone service was necessary for work, but that her employer, IBM, would not reimburse her for this expense. The Debtor also indi-

cates, under oath, on her December 7, 1999 Amended Schedule J that the Internet Service Provider charge of $26.00 per month is also necessary for her work. Thus, evidently, IBM does not reimburse at least $126.00 per month in ostensibly necessary and integral business expenses. Further, in both her Original Schedule J and her Amended Schedule J, Debtor includes $400.00 per month for food. She claims on her Schedule J that this includes "lunch and occasional dinner out *necessary* for work." (emphasis added).

Utilizing the disposable income test of 11 U.S.C. § 1325(b)(2), the unreimbursed business and business-related expenses are to be considered in calculating disposable income. 11 U.S.C. § 1325(b)(2) provides:

> (2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—
>
> (A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions ...; and
>
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Section 1304(a) of Title 11 defines a debtor engaged in business as "[a] debtor that is self-employed and incurs trade credit in the production of income from such employment...." Debtor is an employee of IBM; she is not self-employed. Therefore, by the very definitions of 11 U.S.C. §§ 1304(a) and 1325(b)(2)(B), the business-related expenses shall be considered in determining disposable income.

It is also not insignificant that Debtor offered no evidence or testimony to suggest that she has even requested reimbursement for these expenses. Under the circumstances, it seems unreasonable to assume that the Debtor would not be reimbursed for these expenses. Accordingly, her expenses should be reduced by the sum of $126.00 for the Internet Service

Provider and cellular telephone expenses. Further, the monthly food expense of $400.00 (some of which Debtor says is necessary for work) should be reduced, at least insofar as it is ostensibly "necessary" for business.

### d. *Home Maintenance*

 Debtor has budgeted $400.00 per month for home repairs and upkeep. Debtor pays $120.00 per month for yard maintenance. The yard maintenance includes service for mowing, fertilizing and watering her lawn. This is unreasonable for a Debtor who maintains that she is living frugally. *See e.g., In re Wood,* 92 B.R. 264, 266 (Bankr.S.D.Ohio 1988) (in a Chapter 13 plan, in conjunction with other expenses, $29.00 for lawn care found to be unreasonable). In addition, the Debtor advises that her home needs to be painted and that the home needs a new roof, interior flooring and a furnace. "Cosmetic repairs" are not reasonably necessary "for the maintenance or support" of this Debtor. *In re Cavanaugh,* 175 B.R. 369 (Bankr.D.Idaho 1994). Quite simply, there is no evidence demonstrating that if the repairs are not completed, the house will be rendered uninhabitable or will suffer accelerated deterioration. Thus, this Court determines that the Debtor's original budgeted amount of $100.00 for home maintenance should be utilized in determining disposable income.

### e. *Transportation*

 Debtor's Original Schedule J provided for monthly transportation expenses in the amount of $100.00. Debtor's Amended Schedule J has increased monthly transportation to $242.00, an increase of $142.00. The Amended Schedule J includes "parking *and parking tickets,* taxes on plates and registration maintenance and repairs." (emphasis added). Debtor provided no explanation as to why there was an increase in the budgeted monthly transportation expense. Debtor, by her

Amended Schedule J, appears to be budgeting her parking tickets each month, as well. Obviously, parking tickets are (1) not an expense that is reasonably necessary for the "maintenance or support" of this Debtor and (2) cannot be recognized by this Court as a *necessary* expense. The original transportation expense provided by the Debtor of $100.00 is reasonable and shall be utilized by this Court in evaluating repayment ability.

### f. *Premium Cable*

■ According to the Amended Schedule J, the Debtor incurs $58.00 per month for cable service, which includes HBO + HBO2, Cinemax and Encore. This expense was not budgeted on the Debtor's Original Schedule J. Clearly, premium cable television service is not reasonably necessary for a Chapter 7 debtor's support and maintenance. *In re Haddad,* 246 B.R. 27, 35–36 (S.D.N.Y.2000) (the court held that premium cable television service was a luxury and could be reduced from $60.00 to $35.00 for standard cable television service); *See also e.g., In re Ferrell,* 227 B.R. 706, 710 (Bankr.S.D.Ind.1998) (a debtor's Chapter 13 plan was denied confirmation because the debtors were not devoting all of their disposable income to payment sunder a plan, where debtors included expenses for support of their adult children and had two subscriptions for cable television totaling $65.00). At a minimum, Debtor could maintain standard cable service for much less than $58.00 per month or eliminate this expenditure altogether by using an antennae for television reception.

### g. *Pet Care*

■ According to the Debtor, her two dogs are advanced in age and in need of serious veterinary care. Although the Debtor has produced some documentation regarding veterinary bills, the evidence before this Court does not support the budgeting of $250.00 per month—or $3,000 per year—for the care and feeding of Debtor's two dogs. Debtor's Amended Schedule J provides that, of the $250.00 per month for the dogs, $70.00 is allocated for food and $50.00 is allocated for "veterinary maintenance." The Debtor, at trial, stipulated that the average monthly expense for "veterinary care" is $69.00. *Supra* note 1. Even assuming "veterinary care" is separate and distinct from "veterinary maintenance," this entry only totals $189.00. Thus, of the $250.00 budgeted by the Debtor, there remains a discrepancy of *at least* $61.00. *See* discussion *supra* notes 5 and 6.

The issue of whether expenses incurred for the care of elderly pets constitute "disposable income" is one of first impression before this Court. The Bankruptcy Court for the District of Nebraska recently examined this issue in the context of a Chapter 13 plan. *Matter of Wyant,* 217 B.R. 585 (Bankr.D.Neb.1998). In that case, the debtor owned several horses and dogs, which were elderly and required extraordinary veterinary expenses. The court held that

> As between the debtor's elderly horses and dogs and his creditors, I think that the creditors should be paid first. The proposed expenditures [$175.00 per month] on these animals are excessive, unreasonable, and not necessary for the maintenance or support of the debtor or his dependents.

*Id.* at 587. Notwithstanding, the court concluded that the debtor should be permitted to expend $100.00 per month for food and veterinary expenses on his animals. This Court, too, believes that $100.00 per month for the feeding and care of her two dogs is a reasonable expense for this Debtor.

### 3. *Disposable Income*

■ Based upon the above and foregoing, the Debtor has available net monthly income of about $3,657.00. Debtor's monthly expenses can be reduced from $3,891.00, as calculated on the Amended Schedule J, to about $2,824.00. This leaves, at minimum, about $833.00 per

month in disposable income. In a 36–month Chapter 13 plan, $29,988.00 could be available to pay administrative expenses and unsecured creditors. Put another way, approximately 50% or more of the unsecured creditor claims could be paid in three years.

### D. *The "Totality of the Circumstances"*

Having determined that the Debtor has an ability to repay her debts, this Court turns next to the other factors set forth in the *Stewart* case to determine whether under the "totality of the circumstances" this case should be dismissed.

First, this case is not the result of "sudden illness, calamity, disability, or unemployment." To the contrary, the Debtor has been employed by IBM for 20 years and it is likely that she will enjoy a stable—if not an increasing—source of future income. In addition, this case did not arise out of any pending lawsuits, garnishments, repossessions or foreclosures. As the testimony of the Debtor suggests, this bankruptcy emanated, in large measure, from the break-up of a long-term domestic partnership relationship.

Second, the ongoing expenditures by the Debtor and her former domestic partner, which culminated in the filing of this case, far exceeded her individual ability to repay. Third, as discussed above, there is significant disposable income and the Debtor's budget, as amended, is unreasonable and excessive.

Fourth, it is apparent that the Amended Schedules, filed in response to the UST's Motion, reflect expenses which (1) are excessive and unreasonable and (2) do not appear to be an accurate and reliable reflection of the true financial condition of the Debtor. It is evident that Debtor has adjusted her income and expenses in such a manner as to reflect a minimal amount of disposable income or even a monthly deficit. As discussed above, Debtor modified significant errors to her Original Schedule J in her Amended Schedule J. Specifically, her monthly payments to Sears and her monthly medical and dental expenses were reduced dramatically through the corrections made on her Amended Schedule J. Together, the corrections for Sears and monthly medical and dental reduced her monthly expenses by $732.00. As part of the same Amended Schedule J, however, Debtor created new categories for her pets, premium cable television, internet service provider, cell phone and home maintenance. Plainly, Debtor's income and expenses are moving targets prompted by the potential dismissal of this case for "substantial abuse." The Debtor, as a result, is not credible.

Fifth, as a further consequence of the Debtor's conduct, it makes this Court question her good faith in (1) filing this bankruptcy case and (2) correcting and amending schedules as necessary to provide creditors, the U.S. Trustee, and this Court with accurate and reliable information. Thus, based upon the "totality of the circumstances" of this case, the granting of a Chapter 7 discharge to this Debtor is neither equitable nor is it fair to her creditors and constitutes a "substantial abuse" of the provisions of Chapter 7 of the Bankruptcy Code. As such, the Debtor's Chapter 7 bankruptcy case shall be dismissed.

### IV. *CONCLUSION*

IT IS THEREFORE ORDERED that pursuant to 11 U.S.C. § 707(b), this case is DISMISSED.

IT IS FURTHER ORDERED that the Court shall stay entry of this Order dismissing this case for 10 days to allow the Debtor the opportunity to convert this case to Chapter 13.