**In re John Randall LOPER, Deborah Ann Loper, Debtors.**

**No. 05–31559 EEB.**

United States Bankruptcy Court, D. Colorado.

Jan. 24, 2007.

Stephen E. Berken, Denver, CO, for Debtors.

## ORDER DENYING CHAPTER 13 PLAN CONFIRMATION

ELIZABETH E. BROWN, Bankruptcy Judge.

THIS MATTER came before the Court on the Debtors' Motion to Confirm Chapter 13 Plan. The present plan of reorganization represents the Debtors' fifth plan (hereafter "the Plan") filed in this case, since the August 24, 2005 petition date. Both the Standing Chapter 13 trustee (the "Trustee") and EMC Mortgage Corporation ("EMC") continue to object to confirmation. The objections center on three primary grounds: (1) the Plan is not proposed in good faith, given that it would allow the Debtors to continue making mortgage payments on a home encumbered by over $664,000 in debt; (2) the Debtors are not contributing all of their disposable income to the Plan, because the Plan includes unnecessary and unreasonable expenses, including the mortgage payments, and does not account for foreseeable increases in future disposable income; and (3) the Plan impermissibly fixes a 6.5 percent interest rate on the mortgage debt, depriving the lender of its note's

variable rate. EMC and the Debtors disagree on the interpretation of the promissory note's rate of interest and have asked this Court to interpret the contract. However, given the Court's ruling on the first two issues, it is unnecessary for the Court to reach the issue of the proper rate of interest.[1] Based on the evidence presented at hearing, the Court hereby FINDS AND CONCLUDES:

## I. BACKGROUND

The Debtors in this case both enjoy stable employment and a healthy income. Mr. Loper works as a Commercial Lines Agent for Nationwide Agribusiness Insurance Company (hereinafter "Nationwide"). As a result of Nationwide's restructuring in October 2004, Mr. Loper's salary was reduced from $83,000 plus bonuses, to $55,000 plus 8% commissions. Mrs. Loper was recently promoted to the position of Dean of Arts and Sciences at Colorado Mountain College in Glenwood Springs, Colorado. At present, the Debtors' combined monthly net income is $8,599.73. According to the Debtors, they have no reason to believe that this monthly income will increase in the near future.

The Debtors' estimated monthly expenses, as reported on Amended Schedule J, are as follows:

| | |
|---|---|
| Mortgage Payment | $2,794 |
| Electricity and Heating Fuel: | $ 339 |
| Water and Sewer | $ 85 |
| Trash | $ 15 |
| Home Maintenance | $ 100 |
| Food | $ 550 |

1. The Debtors have objected to EMC's proof of claim. Neither the Debtors nor EMC have certified the claim objection or otherwise requested a court determination on it separate from raising this issue in connection with confirmation. At the outset of the confirmation hearing, the Court inquired of EMC whether it would allow the Court to render a ruling on the interpretation of the promissory note that would be binding for all purposes *(i.e.* the claim objection as well), but at that time EMC was unprepared to agree to this.

Since it is unnecessary for the Court to resolve this issue in order to rule on confirmation, the Court declines to do so. Any ruling in this context would only allow the losing party a second bite at the apple. Thus, if one or both of the parties desire to have this Court rule on the note's interpretation, they must request a determination on the claim objection. If the parties agree, they may request a determination based on the evidence already offered at the confirmation hearing.

| | |
|---|---|
| Clothing | $ 125 |
| Laundry and Dry Cleaning | $ 50 |
| Medical and Dental | $ 590 |
| Transportation | $ 338 |
| Recreation | $ 50 |
| Charitable Contributions | $ 68 |
| Homeowner's Insurance | $ 120 |
| Auto Insurance | $ 174 |
| Estimated Tax Payments | $ 125 |
| Property Taxes | $ 220 |
| New Vehicle Budget | $ 375 |
| Second Mortgage Payment | $1,301 |
| Telephone Bills | $ 155 |
| Homeowner's Association Dues | $ 25 |
| Pet Expenses | $ 65 |
| Miscellaneous Expenses | $ 100 |
| Unexpected Emergencies | $ 50 |

In addition, Mrs. Loper currently has $373 automatically deducted from her monthly check to repay a loan from her retirement account. The Debtors seek to continue repaying this loan under their Plan, because they would otherwise suffer negative tax consequences. The loan would be fully repaid by month 22 of their 60–month Plan. They have not, however, proposed to increase Plan payments to reflect the additional disposable income available beginning in month 23.

The budget also reflects monthly medical and dental expenses of $590. This amount reflects $350 per month in co-payments for Mr. Loper's eight heart-related prescription medications, and $240 per month to retire a post-petition medical bill for emergency services Mr. Loper received as a result of a heart incident in April of 2006. The Debtors expect to finish paying for the April 2006 medical expenses approximately thirty months into the Plan. Once again, the Plan does not show an increase in Plan payments in month 31 to reflect this anticipated increase in disposable income.

In July of 2004, the Debtors purchased a house in Dillon, Colorado. The house is approximately 3,000 square feet, with three bedrooms, four bathrooms, and it sits on a 1/4 acre lot. It houses both the Debtors and the Debtors' adult son during his breaks from law school, approximately three months of the year. In order to purchase the house, the Debtors paid $5,000 down, and financed the balance with a first mortgage presently held by EMC, which had a balance of $530,111.11 on the petition date. The Debtors have since taken out a second mortgage, held by U.S. Bank, with a present balance of $132,913.82. On the petition date, they owed real property taxes of $1,217.09. Thus, as of the petition date, the total secured indebtedness owed against the Dillon home was $664,245.02. The only evidence in the record as to the value of the home is $670,000, as reflected in the Debtors' schedules. Given accruing interest and costs of sale, the Debtors do not appear to have any appreciable amount of equity in this home.

According to Mr. Loper, this home was one of the least expensive homes available in Dillon at the time of their purchase. The Debtors chose to live in Dillon because of the peculiar location of each of their respective jobs. Through his employment with Nationwide, Mr. Loper travels approximately 4,000 miles each month. His sales route includes territory from I–25 all the way to Western Kansas. Mrs. Loper works in Glenwood Springs, and she travels approximately 200 miles per day to and from work. Mr. Loper testified that they surveyed the housing markets in other nearby cities, but concluded that Dillon was the most reasonable market for their needs.[2]

---

2. On direct examination, Mr. Loper stated that the housing market at the time they purchased their home was significantly more expensive in Vail, Beaver Creek, Avon, and Edwards. Moreover, the Debtors did not want to locate further east near locations such as Idaho Springs or Georgetown, because it would force Mrs. Loper to commute to work over two mountain passes instead of one.

Nevertheless, the monthly cost associated with this home is substantial. According to the Plan, the Debtors will be paying $4,786 per month in mortgage payments. This amount represents payments of $2,794 on the first mortgage,[3] $1,302 on the second mortgage, and $690 for the combined arrearages on both mortgages.[4] Other expenses directly related to this home for property taxes, water, sewer, trash, insurance, dues, maintenance, and utilities aggregate $904. Thus, every month the Debtors estimate spending $5,690 on a home in which they have little or no equity and will likely never have equity, since they are making interest only payments on a ten-year mortgage. In essence, the Debtors propose to pay $5,690 per month to rent a home.

The primary purpose of the Debtors' Plan is, of course, to save their interest in this home. In order to do so, they propose to discharge more than $133,000 in unsecured debts by paying $13,814 to their unsecured creditors, which represents a dividend of slightly less than 10%.

## II. DISPOSABLE INCOME TEST

■ "If the trustee or the holder of an allowed unsecured claim objects to confirmation of the plan, then the court may not approve the plan unless, ... (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period ... will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). The Court cannot interfere in the absence of an objection filed by either the trustee or unsecured creditor, but once such an objection has been lodged, the Court must scrutinize the debtor's income and expenses to determine whether all projected disposable income has been committed. Although an objector may only object to a particular itemized expense, the court is free in its analysis to consider all income and expenses. *In re Jones,* 55 B.R. 462, 466 (Bankr. D.Minn.1985). The Court's analysis should take the debtor's particular circumstances into consideration, and the view the expenses as a whole. *In re Woodman,* 287 B.R. 589, 593 (Bankr.D.Me.2003) *(aff'd Evergreen Credit Union v. Woodman,* 2003 WL 23709465 (D.Me. Sept.19, 2003), aff'd 379 F.3d 1 (1st Cir.2004). It is not required to, nor does this Court wish to, scrutinize every single expense in a debtor's Chapter 13 budget. Some flexibility must be built in for plan feasibility under § 1325(a)(5). *In re Reyes,* 106 B.R. 155, 158 (Bankr.N.D.Ill.1989).[5]

■ For cases filed prior to October, 2005, such as the present case, § 1325(b)(2)(A) defined "disposable income" as "income which is received by the debtor and which is not reasonably necessary to be expended ... for the maintenance or support of the debtor or a dependent of the debtor...." The phrase "reasonably necessary" refers to those items which are "sufficient to sustain basic needs [regardless of the debtor's] former status in society or the lifestyle to which he is accustomed...." *Warren v. Taff (In re Taff),* 10 B.R. 101, 107 (Bankr.D.Conn. 1981); accord *In re Hedges,* 68 B.R. 18, 20 (Bankr.E.D.Va.1986). A plan should not be confirmed "whenever debtors include

**3.** This amount is in dispute, and may actually be higher.

**4.** The arrearage total of $17,965 must be cured within 26 months under the Plan.

**5.** An objecting party bears the initial burden of producing evidence in support of a § 1325(b) objection; the debtor, however, retains the ultimate burden for all elements of plan confirmation. *In re Woodman,* 287 B.R. 589, 593 (Bankr.D.Me.2003) *(aff'd Evergreen Credit Union v. Woodman,* 2003 WL 23709465 (D.Me. Sept.19, 2003), aff'd 379 F.3d 1 (1st Cir.2004).

in their budgets expenditures for luxury items, or excessive expenditures for non-luxury items." *In re McDaniel,* 126 B.R. 782, 784 (Bankr.D.Minn.1991) (citing *In re Navarro,* 83 B.R. 348, 355–56 (Bankr. E.D.Pa.1988)).

The Debtors' fifth Plan fails to satisfy the disposable income test. It fails to commit all of the Debtors' projected future income. It includes an unreasonable budgeted amount for housing and it includes repayment of an unsecured pre-petition loan from a retirement account.

## A. Projected Future Disposable Income

██ As set forth more fully above, the Plan proposes to fully repay a retirement plan loan by month 22 of the Plan and to retire the post-petition medical debt by month 30. Nevertheless, the Plan does not provide for a corresponding increase in payment to the Class IV unsecured creditors following the retirement of these debts, and continuing through the remaining life of the Plan. Ordinarily, a Chapter 13 plan does not have to include a debtor's speculative projected income during the relevant plan period.[6] *See In re Krull,* 54 B.R. 375, 378 (Bankr.D.Colo.1985) (potential to earn additional commissions too speculative); *In re King,* 308 B.R. 522, 529 (Bankr.D.Kan.2004) (determining future income based on past bonuses too speculative); *Commercial Credit Corp. v. Killough (In re Killough),* 900 F.2d 61, 65 (5th Cir.1990) (potential for overtime earnings too speculative). However, the additional income the Debtors will receive when the payments expire for the medical bills and retirement plan loan repayment is not speculative for the purposes of § 1325(b), and should have otherwise been included in the Plan payments. The failure to include the necessary step-up in payments beginning in months 22 and 30

by itself causes this Plan to fail the disposable income test.

## B. Mortgage Payments

██ Debtors who cannot pay their unsecured creditors in full are expected to undergo a moderate amount of belt-tightening in order to ensure the integrity of a Chapter 13 plan. *In re Jones,* 119 B.R. 996, 1000 (Bankr.N.D.Ind.1990). A line item entry on Schedule J for a homestead is to be scrutinized under § 1325(b) with the same vigor as any other item. "Even non-discretionary expenditures such as for food and shelter can reflect discretionary lifestyle choices." *In re Gonzales,* 157 B.R. 604, 608 (Bankr.E.D.Mich.1993). The focus of inquiry under the "reasonably necessary" test is to ensure that a debtor is not maintaining an excessive lifestyle to the detriment of unsecured creditors. *See e.g., In re Wood,* 92 B.R. 264, 266 (Bankr. S.D.Ohio 1988). The issue of whether a debtor's mortgage payments are reasonably necessary has not been squarely addressed in a published decision from within the Tenth Circuit. However, after analyzing case law in other jurisdictions, and considering the particular facts and circumstances of this case, this Court concludes that the Debtors have not met their burden to show that the retention of their home, with its associated expense, is reasonably necessary for their maintenance and support.

In *In re Nissly,* 266 B.R. 717, 720 (Bankr.N.D.Iowa 2001), the court denied plan confirmation where the monthly mortgage payments were $1,790 for a family of four, and represented 20% of the debtors' monthly income. General unsecured creditors would have received a dividend of 5.84%. *Id.* at 719. The debtors' mortgage debt was $183,000 on a home valued at approximately $230,000. *Id.* at 718. The court held that the mortgage payment ex-

---

**6.** Under pre-BAPCA law, this period is 36 months. 11 U.S.C. § 1325(b)(1)(B).

pense was excessive, especially considering the debtors' low amount of equity in the house. *Id.* at 720–21.

In *In re Kitson,* 65 B.R. 615, 616 (Bankr.E.D.N.C.1986), the court denied plan confirmation wherein the debtors sought to pay monthly mortgage payments of $1,925 for a family of four, living in a 3,200 square-foot home. The mortgage payment represented 27% of the debtors' monthly net income, and unsecured creditors would have received a 38% dividend. *Id.* The court held that the family should move to rental housing, as they would certainly be able to find a rental unit for less than their current mortgage payment. *Id.* at 621.

Finally, in *In re Baird,* 2005 WL 612863 at *2 (Bankr.E.D.Iowa March 10, 2005), the court denied confirmation of a plan that would have allowed the debtors to pay monthly mortgage payments of $1,692, on a home for a family of five, with 2,800 square-foot home. The mortgage payment represented 28% of their monthly income, and unsecured creditors would have received a 31 % dividend. *Id.* at *4. The court denied plan confirmation in light of what it deemed to be an excessively high mortgage payment for two reasons: the debtors had purchased the home when they were already contemplating bankruptcy, and they had also failed to prove that the mortgage payments were necessary for their maintenance and support. *Id.* at *5. The court held that the debtors had to reduce their monthly housing costs "[i]n consideration of fair treatment of creditors." *Id.* at *4.

The Debtors stated that their home was one of the least expensive in the relevant area, and that Dillon was the only suitable locale for the couple, given their diverse employment locations. However, the Debtors ultimately bear the burden of proof regarding the necessity of their living expenses. They have not produced any evidence that suitable rental or other housing is unavailable in Dillon for less than $4,000 per month. Moreover, at two-thirds of their monthly net income, the Debtors' housing costs devour a greater portion of funds otherwise available to pay unsecured creditors than in any other case discussed above. The Debtors could certainly exercise a little belt-tightening with their housing costs while maintaining a suitable living environment for their family. Since they have little or no equity in their home and would be paying interest only during the Plan period, they will lose very little by being forced to select a suitable rental or other property in lieu of their current residence. Chapter 13 debtors who propose to pay less than full value for their unsecured creditors should not "expect to go 'first class' when 'coach' is available." *In re Kitson,* 65 B.R. 615, 622 (Bankr.E.D.N.C.1986).

Although it is not applicable in this case, it is noteworthy that under current § 1325(b)(3), had the Lopers filed their petition after October 16, 2005, a presumption would arise that they would only be entitled to a monthly mortgage expense of $1,234. As amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), if a debtor's current monthly income is above the highest median income for a family of the same or smaller size in a given state, their reasonable living expenses must be calculated according to the provisions of § 707(b)(2)(A). 11 U.S.C. § 1325(b)(3). Under the definition of current monthly income in § 101(10A), the Lopers monthly income is above the highest median income in Colorado for a family of two.[7] The

7. For purposes of this discussion, the Court must conclude that the Loper's family size is two, instead of three. Their son is beyond the age of majority, and they do not contribute to his living or educational expenses.

applicable provision of § 707 states that "[t]he debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National Standards and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides, as in effect on the date of the order for relief...." 11 U.S.C. § 707(b)(2)(A)(ii)(I). The IRS Local Housing and Utility Standard allowed mortgage payment for a two-member household in Summit County, Colorado is $1,234.[8]

There is no *per se* requirement for debtors to pay large dividends to unsecured creditors. *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983). And the Court is not attempting to " 'squeeze the last dollar' from debtors to fund their Chapter 13 plan." *In re McDaniel*, 126 B.R. 782, 784 (Bankr.D.Minn.1991)(citing *In re Otero*, 48 B.R. 704, 708 (Bankr.E.D.Va.1985)). However, in cases such as the one at bar, a low percentage of payments to unsecured creditors, coupled with excessively high mortgage payments and an insufficient showing of necessity for such large payments, forces this Court to deny plan confirmation in favor of increasing the monies available to pay creditors. Where debtors choose to retain expensive housing, "it is they that should bear the cost of the unusual and improvident expenses which unfairly discriminate against unsecured creditors." *In re Leone*, 292 B.R. 243, 245 (Bankr. W.D.Pa.2003) (citing *In re Rice*, 72 B.R. 311, 313 (D.Del.1987)).

## C. Repayment of Retirement Plan Loan

The Debtors' Plan gives preferential treatment to the retirement plan loan, by proposing to repay this unsecured loan in full. Although the Trustee did not specifically object to the preferential treatment of these loan repayments, the Court has the ability to examine all of the budgeted items under § 1325(b)(2). The Court concludes that these payments are not reasonably necessary for the maintenance and support of the Debtors.

The Tenth Circuit has not addressed the issue of voluntary retirement plan contributions under § 1325(b). *In re King*, 308 B.R. 522, 530 (Bankr.D.Kan.2004). Nor has it addressed the related issue of repayment of retirement plan loans.[9] Bankruptcy courts within this jurisdiction, however, have dealt with the issue and, in general, they have applied the same analysis to both plan contributions and repayment of plan loans. *See In re Cohen*, 246 B.R. 658, 666–67 (Bankr.D.Colo.2000) (discussing cases). As long as the loan repayments are voluntary, they also must be scrutinized under the same test for "reasonably necessary for the debtor's maintenance and support...." *Id.* at 667; *see also In re Anes*, 195 F.3d 177, 180 (3d Cir.1999) (holding that loan repayments effectively constitute contributions to the debtor's retirement account).

Some courts have adopted a blanket prohibition against retirement plan contributions and plan loan repayments, based on a perception of "inherent unfairness in a debtor paying himself by funding his own savings account, retirement plan, or pension fund while paying creditors only a

---

**8.** These standards are available at http://www.usdoj.gov/ust.

**9.** For cases filed after the effective date of BAPCPA, however, "[a] plan may not materi-

ally alter the terms of a loan described in section 362(b)(19) and any amounts required to repay such loan shall not constitute 'disposable income' under section 1325." 11 U.S.C. § 1322(f).

fraction of their just claims." *In re Nation*, 236 B.R. 150, 152 (Bankr.S.D.N.Y.1999)(effectively overruled by *New York City Employees Retirement Sys. v. Sapir (In re Taylor)*, 243 F.3d 124 (2nd Cir.2001)); *accord In re Bayless*, 264 B.R. 719, 721 (Bankr.W.D.Okla.1999). Other courts have rejected a *per se* prohibition, reasoning that "[t]here is little reason for a 'fresh start' that will only be answered with a substantial incapacity to provide for oneself at retirement." *In re King*, 308 B.R. 522, 532 (Bankr.D.Kan. 2004). Recognizing significant competing interests between the rights of unsecured creditors and the retirement needs of debtors, many courts have adopted a case-by-case approach to analyze these repayments. *See In re Osborne*, 2003 WL 1960375 at *5 (Bankr.D.Colo. April 8, 2003). They weigh several factors: (1) the age of the debtor and the amount of time until expected retirement; (2) the likelihood that stopping payments will jeopardize the debtor's fresh start; (3) the number and nature of the debtor's dependants; (4) evidence that the debtor will suffer adverse employment conditions if the contributions are ceased; (5) the debtor's yearly income; (6) the debtor's overall budget; and (7) any other constraints on the debtor that make it likely that the retirement contributions are reasonably necessary expenses for that debtor. *In re King*, 308 B.R. at 531. None of these factors is dispositive, and each case should be assessed on its individual merits. But the vast majority of cases tip in favor of the rights of unsecured creditors. *In re Osborne*, 2003 WL 1960375 at *3 (citing *In re Taylor*, 243 F.3d 124, 129–30 (2nd Cir. 2001)).

In this case, even if the Court follows the more lenient case-by-case approach, it finds no special circumstances present to tip the scales in favor of allowing the Debtors to fund their retirement through repayment of this loan. The Court notes that this is a 60–month plan, but Mr. Loper is only 51 years old. The Debtors presented no evidence of either Mrs. Loper's age, or the amount of time before they will both retire. They presented no evidence of any financial support they provide to their son while he is in law school. There was no evidence to suggest that Mrs. Loper's employment would be in jeopardy if she stopped making these payments. Based on the lack of evidence, the Court cannot find that the retirement contributions, through the form of loan repayments, is reasonably necessary during the course of their Chapter 13 Plan. No one disputes that planning for retirement is important, and necessary, but absent unusual circumstances it should not be placed ahead of repayment of debt. Of course, when Mrs. Loper fails to repay the loan, she will suffer tax penalties for early withdrawal. Such penalties can properly be paid, and the amount offset against the amount that would otherwise be paid into the Plan, resulting in something less than a full increase of $373 per month. *See In re Cohen*, 246 B.R. 658, 667 (Bankr.D.Colo. 2000). Thus, the Debtors need not incur any additional unpaid tax debts.

## III. GOOD FAITH

Section 1325(a)(3) also requires the Court to find that a plan has been "proposed in good faith." The Bankruptcy Code does not itself define "good faith." But the Tenth Circuit has provided guidance through its adoption of a "totality of the circumstances" test. *See Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983); *Pioneer Bank v. Rasmussen*, 888 F.2d 703 (10th Cir.1989); *Robinson v. Tenantry*, 987 F.2d 665 (10th Cir.1993); *In re Young*, 237 F.3d 1168 (10th Cir.2001). Under this test, the court is to make a determination of good faith on a case-by-case basis, looking at the totality of the facts and circum-

stances of the particular case, considering without limitation, the following factors:

1. The amount of proposed payments and the amount of the debtor's surplus;

2. The debtor's employment history, the likelihood of future increases in income & the ability to earn;

3. The probable or expected duration of the plan;

4. The accuracy of the plan's statements of the debtor's expenses, whether any inaccuracies are an attempt to mislead the court, and the percentage repayment of unsecured debt;

5. Whether the debtor has stated his debts accurately;

6. Whether the debtor has made any fraudulent misrepresentations to mislead the bankruptcy court;

7. The extent of preferential treatment between classes of creditors;

8. The extent to which secured claims are modified;

9. The frequency with which debtor has sought bankruptcy relief;

10. The burden which the plan's administration would place upon the trustee;

11. The existence of special circumstances, such as inordinate medical expenses;

12. The type of debt sought to be discharged and whether any such debt would be non-dischargeable in a Chapter 7 bankruptcy proceeding;

13. The motivation and sincerity of the debtor in seeking Chapter 13 relief; and

14. Whether the debtor is using Chapter 13 to unfairly manipulate the Bankruptcy Code.

In this case, the Debtors have no difficulty satisfying most of the good faith factors. Their Plan is already extended to the maximum 60 months. The Debtors' employment history does not indicate they are likely to receive future increases in income. They are not trying to discharge debts that would otherwise be non-dischargeable in a Chapter 7 case. There has been no suggestion that the Debtors have misstated their expenses or debts or otherwise made any misrepresentations to the Court. As far as the Court is aware, this is the only bankruptcy filed by these Debtors. The Plan's administration is unlikely to pose any special problems for the Chapter 13 trustee, as least as soon as the objection to EMC's claim is resolved. There do not appear to be special circumstances beyond the Debtors' control. The Debtors' motivation and sincerity in seeking Chapter 13 relief appears genuine to the Court. Superficially, it might appear that the eighth factor is implicated, the extent to which secured claims are modified, but given that the Debtors seek only to interpret the promissory note, rather than to modify it, the Court does not find this factor against the Debtors.

On the other hand, the Plan proposes to give preferential treatment to the unsecured retirement loan. It fails to include the future increases in disposable income that will occur with retirement of the postpetition medical debt. Finally, it proposes to commit two-thirds of the Debtors' income to keep a home in which they have little or no equity, which this Court finds is unreasonable under the facts and circumstances of this case, thereby causing the Plan to fail the first factor regarding the amount of proposed payments and the amount of the Debtors' surplus.

Admittedly, this good faith analysis closely resembles the disposable income analysis. Courts are split on whether § 1325(a)'s good faith analysis is relevant when the primary issue is the debtor's

stated expenses. Section 1325(b) was added to the Code as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984 ("BAFJA"). This new section codified the "ability to pay" test, which established both a minimum and a maximum amount of plan payments a debtor would be expected to pay under a Chapter 13 plan. *In re Pierce*, 82 B.R. 874, 879 (Bankr.S.D.Ohio 1987). Some courts hold that the BAFJA amendments effectively limited the scope of a good faith analysis to "whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code." *In re Thompson*, 116 B.R. 794, 796 (D.Colo.1990)(quoting *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir.1987)). Therefore, some courts reason that an analysis of the debtor's expenses and resulting plan contribution should be appropriately handled only under the disposable income test. Other courts hold that the financial sacrifices a debtor must make in order to ensure a successful plan remain elements of good faith, and thereby invite consideration under both of the relevant Code sections. *See e.g. In re Reyes*, 106 B.R. 155, 157 (Bankr.N.D.Ill.1989); *In re Krull*, 54 B.R. 375, 377 (Bankr.D.Colo.1985) (effectively merging the § 1325(b) disposable income test into the first *Flygare* factor). Since the Tenth Circuit has never limited the good faith test under *Flygare*, this Court will consider the Debtors' stated expenses under both § 1325(a)(3) and (b).

The Court is mindful of the fact that none of the *Flygare* factors is dispositive of the good faith issue in any given case. *See Pioneer Bank v. Rasmussen*, 888 F.2d 703, 705 (10th Cir.1989). Nor is it a matter of comparing the number of factors that side with the Debtors to the number that favor the objectors. Rather, the weight given to each factor will vary depending on the facts of a particular case. *Flygare v. Boulden*, 709 F.2d 1344, 1348 (10th Cir.1983). The good faith test ultimately requires the Court to make a subjective determination of whether the Plan, and the process employed leading up to it, are in keeping with the spirit of Chapter 13 and its intended purposes. The debtor ultimately retains the burden of establishing this good faith. *In re Ford*, 345 B.R. 713, 716 (Bankr.D.Colo.2006). In this case, the Court cannot find that the Debtors have satisfied their burden. The Plan does not represent the Debtors' best efforts to repay their creditors, but instead attempts to allow them to maintain a certain lifestyle to the detriment of their creditors.

## IV. CONCLUSION

Based on the foregoing, the Debtors' Motion to Confirm is hereby DENIED. Debtors will have sixty days to amend the Plan if they so choose. Since the Debtors have already filed five plans, they will be afforded only one additional opportunity to propose a plan in this case. If they are not able to confirm the next plan, the Court will dismiss this Chapter 13 case.