### In re Coleen Elaine FORD, Debtor.

### No. 05–29362–HRT.

United States Bankruptcy Court, D. Colorado.

June 8, 2006.

---

Sharon W. Grossenbach, Denver, CO, for Debtor.

## ORDER REGARDING CONFIRMATION OF CHAPTER 13 PLAN

HOWARD R. TALLMAN, Bankruptcy Judge.

THIS MATTER comes before the Court on First National Bank of Omaha's ("First National") Objection—Response in Opposition to Confirmation of Debtor's Proposed Amended Chapter 13 Plan. A hearing was held on April 27, 2006. The Court has reviewed the facts and arguments presented by the parties, as well as the pertinent legal authority, and hereby makes the following findings of fact and conclusions of law, pursuant to Fed.R.Bankr.P. § 7052.

### JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(a) and (b) and 28 U.S.C. § 157(a) and (b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), as it concerns the administration of the Estate.

### BACKGROUND

Debtor originally filed for bankruptcy under Chapter 7 on August 3, 2005. On November 14, 2005, First National began an adversary proceeding by filing a Complaint seeking to have all or a portion of its debt determined to be non-dischargeable. Debtor moved to convert her Chapter 7 case to a case under Chapter 13 on December 14, 2005. Debtor testified that she

converted to a Chapter 13 to avoid the expense of hiring an attorney to defend herself in the Chapter 7 adversary proceeding. She filed her Chapter 13 plan on December 30, 2005. First National filed an Objection thereto on January 11, 2006. The Debtor subsequently filed an Amended Chapter 13 Plan on January 25, 2006 (the "Plan"). First National filed an Objection to Confirmation of Debtor's Chapter 13 Plan on February 22, 2006.

According to Debtor's Amended Schedules D and F, the majority of Debtor's debt consists of $144,060.00 in secured debt, including a $125,126.05 first mortgage with World Savings Bank, a $5,027.00 second mortgage with U.S. Bank (which Debtor explained is a home equity line of credit), and a $6,659.21 lien on her 1998 Buick Regal held by Guarantee Bank & Trust.

Debtor reports $38,734.00 in unsecured debt. First National has the largest debt among the unsecured creditors. First National filed two proofs of claim, the first for $20,060.34 and the second for $173.75, both relating to Debtor's credit cards with First National. No other creditor objected to Debtor's Plan.

Debtor's Plan proposes payments to the Chapter 13 Trustee at a rate of $260 per month over 36 months. The secured, mortgage creditors would be paid outside the Plan. Secured creditor, Guarantee Bank & Trust would be paid the value of its collateral through the Plan, along with administrative expenses and other creditors. Unsecured creditors, including First National, are projected to receive payments representing a 6% dividend.

## DISCUSSION

The Bankruptcy Code, 11 U.S.C. § 1325, sets forth a number of criteria for approval of a Chapter 13 Plan. The criteria at issue in this case are:

(1) The plan has been proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1325(a)(3).

(2) The debtor will be able to make all payments under the plan and to comply with the plan. 11 U.S.C. § 1325(a)(6).

■ The Debtor has the burden of proof concerning the elements of § 1325(a). *See In re Anderson,* 173 B.R. 226, 229 (Bankr. D.Colo.1993).

## I. *GOOD FAITH*

### A. *Flygare* Factors

■ In *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir.1983), the Tenth Circuit adopted a "totality of circumstances" test for determining whether a Chapter 13 plan has been proposed in "good faith" pursuant to § 1325(a)(3). The Tenth Circuit listed eleven factors to consider in evaluating the "totality of the circumstances." *Id.* This list is not exhaustive, and the weight given each factor necessarily varies with the facts and circumstances of each case. *Id.* A single factor alone is not enough to establish bad faith. *See In re Young,* 237 B.R. 791, 798 (10th Cir.BAP1999).

### B. *Flygare* Factors Applied to Debtor's Case

■ Applied to this case, the Court finds the following factors to be dispositive:

#### (1) Amount of Payments are Reasonable

The amounts of Debtor's proposed payments are reasonable. First National raised concerns that Debtor's initial surplus of $220 as reported in her original Chapter 7 case increased to $260 by the time of her Amended Chapter 13 Plan. The Court finds that the increase in Debt-

or's surplus does not indicate bad faith, but rather reflects significant "belt-tightening". Debtor has made in a good faith effort to pay her creditors. The Court will discuss Debtor's efforts to reduce her expenses in more detail when it addresses the feasibility of Debtor's Plan.

### (2) Debtor's Employment History and Income

The Court heard testimony on Debtor's employment record for the past year. Debtor formerly held two jobs, one as an administrative assistant for the Seff Group and the other as a part-time delivery driver for Dominos Pizza. Debtor was laid-off from her position with the Seff Group in late November/early December 2005, but continues to work for Dominos Pizza.

Debtor has been otherwise unemployed since being laid-off. Debtor reports unemployment benefits in the amount of $1,824.00 per month, which she will receive through June 2006.

Debtor testified that she is registered with several employment agencies, has "tested out" of entry level positions to qualify for potential, more-senior administrative positions, and has made herself available for temporary positions. She has interviewed with at least five prospective employers since November, 2005. She anticipates taking temporary positions as an administrative assistant once her unemployment benefits run out, if she has not found permanent, full-time work.

Debtor testified that she continues to seek full-time employment and the Court finds her testimony credible. Assuming Debtor is able to find work in the coming year, her income is likely to increase.

Based on these facts, the Court finds it reasonable to assume that Debtor will have an income sufficient to contribute at least $260 per month over the course of her 36 month plan.

### (3) Duration of the Plan is Reasonable

■ The three-year duration of the plan is reasonable. In *In re Young*, the Tenth Circuit Bankruptcy Appellate Panel observed that proposing a three-year rather than a five-year plan is not per se bad faith. *See In re Young*, 237 B.R. at 798. Here, the shorter 36 month plan proposed by Debtor is reasonable in light of Debtor's age (56 years old) and more limited employment prospects as she nears retirement age.

### (4) The Statements in Debtor's Plans are Reasonably Accurate

The Court finds that the differences in Debtor's Schedules I and J from the time of her original Chapter 7 petition to the time of her Amended Chapter 13 Schedules reflect significant belt-tightening by Debtor and good faith efforts to report her income and expenses accurately. The Court will consider the level of expenses in addressing feasibility.

### (5) No Preferential Treatment Among Classes of Creditors

The Court finds no preferential treatment among classes of creditors. Debtor proposes to pay the two mortgages in full outside of the Plan and pay the value of her vehicle through the Plan. The priority of the mortgage payments is reasonable because it relates to Debtor's primary residence, and the statute requires it. Unsecured creditors are being treated as one class and are receiving the same pro-rata dividend.

### (6) Plan Does Not Unreasonably Affect Secured Creditors

Debtor's Plan does not unreasonably affect the rights of secured creditors.

Though Debtor's plan modifies the rights of Guarantee Bank & Trust, the lienholder of debtor's 1998 Buick, the Bank has not objected to its treatment under the Plan.

### (7) Type of Debt and Whether Any Such Debt Is Non–Dischargeable in Chapter 7

As reported in Debtor's Schedule F, the type of debt sought to be reorganized under the Chapter 13 Plan is unsecured consumer debt related to credit card purchases and cash advances, overdraft protection, penalties for bounced checks, and medical expenses. The Court heard evidence that Debtor's credit card debts relate to her gambling activity and will discuss Debtor's gambling in more detail below.

The Court did not hear specific evidence on whether Debtor's debt was non-dischargeable in a Chapter 7 bankruptcy. Debtor did testify that she converted her Chapter 7 case to a Chapter 13 case to avoid attorney's fees she believed she would incur in defending against First National's Adversary Proceeding. The Debtor's belief that she would incur such fees in adversary litigation is well-founded. The issue of non-dischargeability would have been litigated in the Chapter 7 case, but the Court has no evidence or information to know whether First National would have been successful in obtaining such a judgment. Under these circumstances, the Court cannot find Debtor's decision to convert to a Chapter 13 in order to avoid additional attorney's fees to be an unreasonable one.

### (8) Special circumstances

The Court finds that Debtor's unemployment, and efforts to find full-time employment, are "special circumstances" which it will take into consideration. During her unemployment, Debtor has continued to maintain a part-time job as a driver for Domino's Pizza. Debtor has made good faith efforts to find new full-time employment and has made herself available for temporary positions.

### (9) Multiple Filings

■■■ The Court recognizes that the Debtor's bankruptcy has evolved since the initial filing of her Chapter 7 petition. However, converting a case from Chapter 7 to one under Chapter 13 does not constitute a "multiple" filing. Multiple or successive bankruptcy filings may, but do not necessarily constitute bad faith or lack of good faith. *See In re Merrill,* 192 B.R. 245, 249 (Bankr.D.Colo.1995) (finding bad faith where debtor filed six Chapter 13 bankruptcies and seven total bankruptcies within eight-year period). This is not a multiple filing case and the Court has found that the conversion of the case was not in bad faith under the circumstances presented here.

### (10) Debtor's Credibility

The Court finds Debtor's testimony at trial sincere and credible. Debtor appears committed to paying her creditors in accordance with the requirements of Chapter 13 by proposing a confirmable Plan. She is current on her Plan payments and the Court believes she should be given the chance to try and consummate her Plan.

### (11) Burden on Trustee

The Chapter 13 Trustee has not objected to the Debtor's Plan, and consequently, the Court finds no significant burden on the Chapter 13 Trustee in administering this Plan.

### C. Debtor's Tax Returns

■■ In addition to the eleven *Flygare* factors, First National asked the Court to consider Debtor's 2005 tax returns. Debt-

or received a tax refund totaling $2,608. Debtor testified that she turned over $1,400 of the tax refund to the trustee and spent the remainder of the tax refund for other purposes. Neither party offered further evidence to explain the $1,400 payment. However, the Court notes that a Chapter 7 trustee is entitled only to the pre-petition portion of the tax refund from January 1, 2005 to the original Chapter 7 petition date of August 3, 2005. This proportion roughly corresponds to the $1,400 paid by the Debtor. The Chapter 13 trustee has not objected to the Plan or sought a reconciliation of the refund portion retained by the Debtor. The Court finds that the division of the tax refund does not suggest bad faith.

### D. Debtor's Gambling

Finally, First National argued in closing that Debtor filed her Chapter 13 in bad faith because the "vast majority" of Debtor's debt is attributable to cash advances related to her gambling activity. The Court does not find this argument persuasive for two reasons.

### (1) Not Supported by Evidence

Debtor has provided the Court with evidence that her Chapter 13 Plan has been proposed in good faith. In final argument, First National claimed that the "vast majority" of the Debtor's debt is gambling debt. That claim is not supported by the evidence.

Debtor testified that some of the charges on her First National credit card reflect cash advances used to gamble or to pay for gambling debts. She explained that she has a gambling addiction and is seeking support through Gamblers Anonymous. On cross-examination, Debtor admitted that she has continued to gamble post-petition.

At trial, First National did not offer evidence on Debtor's credit card charges to rebut Debtor's evidence of good faith. First National did attach five credit card statements from March to August 2005 to its original Adversary Complaint, and listed its Complaint as an exhibit for trial. However, First National provided no testimony or other documentary evidence from which the Court could place these statements into context. Without the necessary evidentiary predicate, the Court has essentially been left to peruse this information and draw what conclusions it might from this unsubstantiated submission. This, the Court will not do. Accordingly, the Court has reviewed but has not given much weight to the Debtor's credit card statements.

The credit card statements suggest that Debtor made most of her minimum payments, including a minimum payment of $362 on May 12, 2005 and a $400 payment on June 28, 2005. When she did not, the statements contained warnings that her card use privileges had been or would be suspended. Debtor appears to have fallen behind on payments in July 2005, just before filing for Chapter 7 bankruptcy on August 3, 2005. The Court further notes that First National continued to extend Debtor credit until she filed for Chapter 7 bankruptcy.

In total, the five credit card statements show charges of about $2,500 designated as withdrawals from an ATM at the Fitzgerald Casino between March and July, 2005. On cross-examination, First National did not question the Debtor regarding the specific charges to the Fitzgerald Casino or any other specific charges made to her First National credit card. The Court has no evidence about whether all, or what portion, of the cash withdrawals were in fact used for gambling. It also cannot discern what portion of First National's total claim represents gambling debts and

over what period of time the claim was incurred.

Debtor testified that her balance increased by $6,500 in February 2005 when Debtor made a balance transfer from another credit card to First National to take advantage of First National's favorable interest rates. Neither party offered into evidence credit card statements from other credit card companies, including any companies that may have been involved in this balance transfer. Consequently, there is no evidence of whether the debts included in this balance transfer related to gambling.

Another significant portion of Debtor's credit card charges to First National are attributed to Smoker Friendly, a tobacco retailer. Neither party offered evidence explaining the remaining charges on Debtor's credit card statements or evidence relating to charges on other credit cards. Without further evidence, the Court has no basis for concluding that Debtor's cash advances for gambling constitute a "vast majority" of her debt.

### (2) Gambling is Not *Per Se* Bad Faith

The Court has reviewed the legal authorities addressing whether a debtor's gambling constitutes bad faith under § 1325(a)(3) and concludes that the Debtor's pre- and post-petition gambling, absent other wrongful conduct, does not constitute bad faith.

Debtor's counsel cites *In re Wolniewicz*, 224 B.R. 302, 306 (Bankr.W.D.N.Y.1998) in which a New York bankruptcy court stated in *dicta* that the bankruptcy system is designed to give debtors a fresh start and that "[g]ambling and substance abuse are examples of personal weaknesses that can have enormously adverse consequences for [the debtor's] financial well-being."

While this may be true, the Court finds more persuasive the reasoning of the Tenth Circuit Bankruptcy Appellate Panel in its unpublished opinion in *In re Wilkins*, 329 B.R. 358, 2005 WL 1926413 (10th Cir. BAP 2005). There, the Chapter 13 Trustee objected to the debtor's Chapter 13 plan on the grounds that the debtor had gambled while in bankruptcy despite the bankruptcy court's order prohibiting her from doing so. The Bankruptcy Panel noted that "[t]he use of budgeted recreation funds for gambling would ordinarily not, without more, constitute an abuse of the provisions, purpose, or spirit of Chapter 13." *Id.* at *3. However, the debtor in that case also committed perjury at trial and violated the bankruptcy court's order to refrain from gambling. *Id.* In light of the debtor's additional bad faith conduct, the Panel held that the Chapter 13 plan had been proposed in bad faith. *Id.*

Though *In re Wilkins* is an unpublished opinion and not binding as precedent, the Court finds its analysis reasonable and consistent with the *Flygare* factors. In this case, Debtor testified that she continued to gamble after filing her Chapter 13 petition. The Court wants to emphasize in the strongest terms that it in no way condones this conduct. Even so, the Debtor testified she is seeking help for her gambling addiction through Gamblers Anonymous. Despite her gambling, Debtor has remained current with her payments to the Chapter 13 Trustee. The Court finds no additional acts of bad faith such as the violation of Court orders or perjury. The Court therefore concludes that Debtor's gambling does not indicate bad faith, although it is something if left unchecked could have disastrous consequences on Debtor's efforts to reorganize under Chapter 13.

### E. First National's Authorities

First National cites several cases from other jurisdictions. These authorities are inapposite.

As Debtor's counsel observes, First National cites a Rhode Island bankruptcy case, *In re Keach,* which was later vacated and remanded by the First Circuit. *In re Keach,* 225 B.R. 264 (Bankr.D.R.I.1998), *vacated and remanded,* 243 B.R. 851 (1st Cir. BAP 2000). The debtor in *In re Keach* had originally filed a Chapter 7 case, but after a determination that a judgment lien was nondischargeable, filed for Chapter 13 reorganization. Significantly, the First Circuit explicitly rejected the "totality of circumstances" approach followed by the Tenth Circuit and other jurisdictions as an example of "pure judicial legislation" which introduces inappropriate moralistic considerations into the interpretation of § 1325. *In re Keach,* 243 B.R. at 868–69. More specifically, the First Circuit held that the bankruptcy court had erred by considering, among other factors, the nondischargeability of the debtor's judgment lien in the Chapter 7 proceeding. *Id.* at 871. Because this Court must follow the Tenth Circuit's more expansive "totality of the circumstances" standard, these First Circuit cases are inapposite.

The remaining authorities cited by First National are distinguishable on their facts. Each case involves problematic conduct which, under the totality of the circumstances of those cases, suggests that the Chapter 13 plan was filed in bad faith.

In *In re Oliver,* 186 B.R. 403, 406 (Bankr.E.D.Va.1995), the court found bad faith under the "totality of the circumstances" where the debtor had originally filed a Chapter 7 case and received a discharge before filing a Chapter 13 petition. The debtor's 17% payment to unsecured creditors was considered minimal in relationship to the type of debt, the court finding the unsecured claims to be "peculiar" in that their dischargeability in the Chapter 7 case was a matter of dispute. Also, the debtor had faced no unusual circumstances justifying a Chapter 13 petition. And, finally, the debtor made no attempt to repay unsecured creditors between the time of his previous Chapter 7 discharge and the filing of his Chapter 13 petition.

In *In re Murrell,* 160 B.R. 128, 130–31 (Bankr.W.D.Mo.1993), the court found bad faith under the "totality of the circumstances." The Court found that the debtor had 1) over-estimated some debts and underestimated others; 2) filed her Chapter 13 petition to avoid a debt to a credit union which would have been nondischargeable in a Chapter 7 case; 3) proposed to pay all secured debt and 52% of unsecured debt in a 36 month period; but most important, 4) had lied in court regarding the status of her wedding ring.

In *In re Jahnke,* 146 B.R. 830, 832–33 (Bankr.E.D.Cal.1992), the court found bad faith under the "totality of the circumstances" where the debtor's Chapter 13 was filed less than one month after the entry of a judgment of nondischargeability of debts in the debtor's original Chapter 7 proceeding. The court found no bona fide change in circumstances that would justify the debtor's successive filings. The debtor failed to disclose a prior adversary proceeding in his statement of affairs. The debtor's plan proposed zero percent payment to unsecured creditors while paying his taxes over 36 months and the debtor did not adjust his proposed payments under the plan after a reported salary increase. Finally, another court had found that the debtor incurred much of his credit card debt through fraud.

### F. Conclusion

In conclusion, the Court holds that, under the totality of the circumstances, Debtor's Amended Chapter 13 Plan is proposed in good faith. *See Flygare v. Boulden,* 709 F.2d 1344 (10th Cir.1983).

## II.  FEASIBILITY OF CHAPTER 13 PLAN

█ This Court believes that the "most important criterion" for the confirmation of a Chapter 13 plan is § 1325(a)(6)'s requirement that the Court determine whether the Debtor will be able to make all payments under the plan and comply with all other provisions under the plan.

█ Amended Schedule J reports $1,964.00 in monthly expenses. Debtor's largest monthly expenses are attributable to her primary residence. Specifically, her monthly home expenses include $718 for the principal mortgage, $200 for the second mortgage, $100 for utilities, $81 for HOA payments.

Debtor testified that she has reduced her expenses through significant belt-tightening. Specifically, Debtor testified that she has found "new minimums" in her monthly expenses and no longer uses credit cards for consumer purchases. Debtor has put off major expenses, including dental work, purchase of eye glasses, home maintenance, and car maintenance while she seeks a higher paying job. She plans to devote a portion of her future income to these deferred expenses if she does in fact find a higher paying job.

Debtor reduced her utility bills to $75 on electric, $9 on water, and $50 on telephone, effectively cutting her utility bills in half.

Debtor has reduced her food budget to $250 per month. Debtor testified she has supplemented her food with donations from a Food Bank and with extra or unsaleable food from her part-time job with Dominos Pizza. Debtor also testified that she provides housing and some food for her 19–year–old son, who is also unemployed.

█ Debtor's Amended Schedule I reports an income of $2,224.00 per month. This consists of a salary of $400 per month as a part time driver for Dominos Pizza and $1,824.00 per month in unemployment benefits. Though unemployment benefits are a significant portion of Debtor's income, it is widely recognized that unemployment benefits are an acceptable basis for feasibility of a Chapter 13 plan. *See In re Hickman*, 104 B.R. 374, 377 (Bankr. D.Colo.) (Brooks, J.); *In re Compton*, 88 B.R. 166, 167 (Bankr.S.D.Ohio 1988); *In re Overstreet*, 23 B.R. 712, 713–14 (Bankr. W.D.La.1982). In addition, Debtor has made efforts to find full-time employment and testified that she will seek temporary work as an administrative assistant when her unemployment benefits run out in June 2006.

This leaves a surplus of $260.00 per month. Debtor testified that she intends to contribute all of the surplus to her Chapter 13 Plan. Though Debtor's proposed Plan assumes a tight budget, the Court finds the Debtor to be credible in her desire to pay creditors. The Court finds that the Debtor is attempting to live within her budget, has accurately reported the actual use of her funds, is current with her payments to the Trustee, and presented credible testimony that she is committed to paying her creditors through her Chapter 13 Plan. Considering all of the circumstances, the Court holds that the Debtor has met her burden and that Debtor's Chapter 13 Plan is feasible.

## III.  CONCLUSION

Given the "totality of the circumstances," Debtor's conversion from a Chapter 7 to a Chapter 13 does not reflect bad faith. On the contrary, Debtor converted to Chapter 13 in order to avoid attorney's fees in defending an Adversary Proceeding. The budget in Debtor's Chapter 13 Plan is tight, but feasible. Despite her tight budget, Debtor is current with her payments to the Trustee. At the

hearing, the Debtor gave credible testimony that she intends to pay her creditors and overcome her gambling problem. In light of these facts, the Court believes the Debtor should be given the benefit of the doubt and have her chance to reorganize under a Chapter 13 plan. If she fails in her Plan, creditors will have a chance to seek conversion to a Chapter 7 case.

For the foregoing reasons, First National's Objection is DENIED and the Debtor's Amended Chapter 13 Plan dated January 25, 2006 is CONFIRMED.